**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

OLLNOVA TECHNOLOGIES LTD.,

    *Plaintiff*,

    v.

ECOBEE, INC.,

    *Defendant*.

Case No. 2:22-cv-00072-JRG

The Honorable J. Rodney Gilstrap

**<u>DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)</u>**

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................................ ii

I.   Introduction .................................................................................................................. 1

II.  Statement of Issues to be Decided ............................................................................. 2

III. Background .................................................................................................................. 2

    A.  The Complaint and Defendant ............................................................................ 2

    B.  The Asserted Patents ........................................................................................... 2

        1.  The '282 Patent ........................................................................................... 2

        2.  The '887 Patent ........................................................................................... 5

        3.  The '495 Patent ........................................................................................... 7

        4.  The '371 Patent ........................................................................................... 8

IV. Legal Standard ........................................................................................................... 10

V.  Argument ................................................................................................................... 12

    A.  The Claims Identified in the Complaint Are Representative ............................ 12

    B.  *Alice* Step 1: The Representative Claims Are Directed to Abstract Ideas ....... 16

    C.  *Alice* Step 2: The Representative Claims Contain No Inventive Concept to Transform the Abstract Ideas into Patent-Eligible Subject Matter ................... 21

    D.  There Are No Claim Construction or Factual Disputes Preventing the Court from Ruling on These Issues at the Rule 12 Stage ................................. 25

VI. Conclusion ................................................................................................................. 26

i

# <u>TABLE OF AUTHORITIES</u>

## Cases

Aatrix Software, Inc. v. Green Shades Software, Inc.,
  882 F.3d 1121 (Fed. Cir. 2018)......................................................................... 11

Affinity Labs of Tex., LLC v. Amazon.com Inc.,
  838 F.3d 1266 (Fed. Cir. 2016)......................................................................... 19

Affinity Labs of Tex., LLC v. DIRECTV, LLC,
  838 F.3d 1253 (Fed. Cir. 2016)............................................................. 1, 11, 19, 22

Alice Corp. v. CLS Bank Int'l,
  573 U.S. 208 S. Ct. 2347 (2014),........................................................... 1, 11, 16, 21

Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,
  841 F.3d 1288 (Fed. Cir. 2016)......................................................................... 24

Ancora Technologies, Inc. v. HTC America, Inc.,
  908 F.3d 1343 (Fed. Cir. 2018)..................................................................... 20, 21

Ashcroft v. Iqbal,
  556 U.S. 662, 678 (2009)................................................................................. 10

Bancorp Servs. L.L.C. v. Sun Life Assur. Co.,
  687 F.3d 1266 (Fed. Cir. 2012)......................................................................... 11

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007)......................................................................................... 10

Berkheimer v. HP Inc.,
  881 F.3d 1360 (Fed. Cir. 2018)......................................................................... 25

Bilski v. Kappos,
  561 U.S. 593 (2010)................................................................................. 11, 12, 16

BSG Tech LLC v. Buyseasons, Inc.,
  899 F.3d 1281 (Fed. Cir. 2018)......................................................................... 22

buySAFE, Inc. v. Google, Inc.,
  765 F.3d 1350 (Fed. Cir. 2014)......................................................................... 18

CardioNet, LLC v. InfoBionic, Inc.,
  No. 20-2123, 2021 WL 5024388 (Fed. Cir. Oct. 29, 2021)................................. 22

Chamberlain Grp., Inc. v. Techtronic Indus. Co.,
  935 F.3d 1341 (Fed. Cir. 2019)......................................................................... 22

ii

*ChargePoint, Inc. v. Sema-Connect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019)......................................................................................... 23

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014)....................................................................................... 12

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011)................................................................................. 11, 16

*Diamond v. Diehr*,
    450 U.S. 175 (1981)........................................................................................................ 12

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
    815 F. App'x 529 (Fed. Cir. 2020) ................................................................................. 26

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
    839 F.3d 1089 (Fed. Cir. 2016)....................................................................................... 19

*First-Class Monitoring, LLC v. Ups of Am., Inc.*,
    389 F. Supp. 3d 456 (E.D. Tex. 2019) ............................................................................ 26

*Health Discovery Corp. v. Intel Corp.*,
    No. 6:20-cv-00666-ADA, 2021 WL 6116891 (W.D. Tex. Dec. 27, 2021).................... 25

In re Rosenberg,
    813 F. App'x 594 (Fed. Cir. 2020) ................................................................................. 11

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017)....................................................................................... 19

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir 2016)........................................................................................ 17

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018)....................................................................................... 19

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012) .............................................................................................. 12, 24

*Mentone Solutions LLC v. Digi International Inc.*,
    No. 21-1202, 2021 WL 5291802 (Fed. Cir. Nov. 15, 2021) ........................................... 21

*Multimedia Plus, Inc. v. Playerlync, LLC*,
    198 F. Supp. 3d 264 (S.D.N.Y. 2016)............................................................................. 25

*MyMail, Ltd. v. ooVoo, LLC*,
    No. 2020-1825, 2021 WL 3671364 (Fed. Cir. Aug. 19, 2021) ............................. 1, 19, 22

*Parker v. Flook*,
    437 U.S. 584 (1978)........................................................................... 12

*Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*,
    No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938 (E.D. Tex. Mar. 8, 2017) ..................... 12

*PPS Data, LLC v. Jack Henry & Assocs., Inc.*,
    No. 2:18-cv-00007-JRG, 2019 WL 1317286 (E.D. Tex. Mar. 21, 2019)........................ 16

*Repifi Vendor Logistics v. IntelliCentrics, Inc.*,
    No. 21-1906, 2022 WL 794981 (Fed. Cir. Mar. 15, 2022)........................................ 16, 23

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018)................................................................... 1, 11

*The Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
    935 F.3d 1341 (Fed. Cir. 2019)........................................................................ 1

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) ....................................................................... 19

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014)................................................................... 11, 21

*Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*,
    916 F.3d 1363 (Fed. Cir. 2017)....................................................................... 19

*Universal Secure Registry LLC v. Apple Inc.*,
    10 F.4th 1342 (Fed. Cir. 2021) ....................................................................... 23

**Statutes**

35 U.S.C. § 101................................................................................ 2, 11, 12, 15

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................... 1, 10

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant ("Defendant" or "ecobee")[1] hereby moves to dismiss Plaintiff Ollnova Technology Ltd.'s ("Plaintiff" or "Ollnova") Complaint (D.I. 1) in its entirety for failing to state a claim upon which relief can be granted.

## I.     **INTRODUCTION**

Ollnova's Complaint alleges that Defendant infringes four patents—U.S. Patent Nos. 8,224,282 ("the '282 patent"), 7,746,887 ("the '887 patent"), 7,860,495 ("the '495 patent"), and 8,264,371 ("the '371 patent") (collectively, "Asserted Patents")—which at bottom claim nothing more than the abstract ideas of communicating information from one location to another and then using that communicated information as desired, carried out using admittedly generic and conventional components.  Thus, the Asserted Patent claims are precisely the type of claims that has been found patent-ineligible under *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 134 S. Ct. 2347 (2014), and its progeny.  *See, e.g.*, *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258-60 (Fed. Cir. 2016) (finding "wirelessly communicating regional broadcast content to an out-of-region recipient" abstract and patent ineligible); *The Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1346-47 (Fed. Cir. 2019) ("Wirelessly communicating status information about a system is similar to abstract ideas we have found in our previous cases."); *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) ("[C]laims focused on 'collecting information, analyzing it, and displaying certain results of the collection and analysis' are directed to an abstract idea.") (citation omitted); *MyMail, Ltd. v. ooVoo, LLC*, No. 20-1825, 2021 WL 3671364, at *5 (Fed. Cir. Aug. 19, 2021) ("We have long 'treated collecting

---

[1]  Plaintiff filed this lawsuit against "ecobee, Inc.," an entity that no longer exists.  As Plaintiff's counsel is aware from the multitude of other lawsuits they have filed against ecobee, the correct legal entity is ecobee Technologies, ULC d/b/a ecobee.  However, in order to avoid unnecessary motion practice or delay adjudication of Plaintiff's meritless claims, ecobee agrees to substitute in the relevant entity as Defendant.

information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas.'") (citation omitted).  Resolving the subject matter eligibility issue at this stage does not require discovery or claim construction, as the patents themselves admit that the recited components and functionality are conventional, and the claims are readily understandable for purposes of the Section 101 analysis.

## II.   STATEMENT OF ISSUES TO BE DECIDED

Whether the claims of the '282, '887, '495 and '371 patents are drawn to patent-ineligible subject matter under 35 U.S.C. § 101 and *Alice* and its progeny.

## III.   BACKGROUND

### A.   The Complaint and Defendant[2]

Ollnova filed this lawsuit against ecobee on March 8, 2022, alleging infringement of the four Asserted Patents.  (ECF No. 1).  Ollnova's infringement allegations are directed to ecobee's SmartThermostat product line, which provides automatic and efficient control over home- and business-based temperature regulating systems.  (*See id.*, ¶¶ 9, 17, 25, 33).  In its complaint, Ollnova identifies "exemplary" Asserted Patent claims as the basis for its infringement allegations, i.e., '282 Patent claim 13, '887 Patent claim 1, '495 Patent claim 1, and '371 Patent claim 13. Ollnova's complaint includes claim charts purportedly applying each exemplary asserted claim to a "representative" accused product.  (*See id.*, Exs. 2, 4, 6, 8).

### B.   The Asserted Patents

#### 1.   The '282 Patent

The '282 patent (ECF No. 1-1) was filed on March 18, 2009, and claims priority to a

---

[2]  A more detailed description of the case background, including the extensive litigation history between ecobee and the law firm representing Plaintiff, is set forth in Defendant's Motion to Transfer Venue to the Western District of Texas, filed concurrently with this Motion.

provisional application filed on March 19, 2008.  The '282 patent purports to have invented an "automation component configured for wireless communication within a building automation system," where the "automation component" includes a "multi-sensor package."  *See* '282 patent, Abstract; 2:23-28; 3:51-4:4.   In its Background section, the '282 patent acknowledges that "building automations system[s] (BAS)" known at the time "integrate[d] and control[led] elements and services within a structure such as the heating, ventilation and air conditioning (HVAC) system, security services, fire systems and the like."  *See id.*, 1:20-23.  These known systems included "application or process specific controllers, sensors, actuators, or other devices distributed or wired to form a network."  *Id.*, 1:23-27.  Furthermore, the '282 patent acknowledges that it was known to communicate sensor information (such as a "temperature indication") to "an automation level network (ALN) or building level network (BLN) configured to, for example, execute control applications, routines or loops … [and] monitor priority based overrides or alarms."  *See id.*, 1:43-51.  The '282 patent identifies various known "[w]ireless devices" for use in such systems for monitoring and communicating information.  *See id.*, 1:63-2:13.  The patent notes that wireless devices must "operate for an extended period on a limited battery charge," and therefore it "may be desirable" for devices to "extend and/or maximize the operating life" of such devices.  *Id.*, 2:14-19.

Against this backdrop, the '282 patent states that its disclosure "generally provides for communicating information between wireless devices and/or automation components operating within a building automation system (BAS)."  *Id.*, 2:23-26.  The patent further states that "[w]ireless devices and/or automation components ***may*** be configured to optimize radio and/or data communications to extend battery life."  *Id.*, 26-28 (emphasis added).  However, nothing in the '282 patent claims recites or is otherwise directed to extending battery life.  Nor do the claims

provide any actual solution to the perceived "optimization" problem, beyond a mere abstract idea applied to generic and conventional components.  This is illustrated in claim 13 below (the only '282 patent claim identified in Ollnova's complaint):

> 13. An automation component configured for wireless communication within a building automation system, the automation component comprising:
>
>> a multi-sensor package configured to detect a plurality of variables and generate sensor data for each detected variable;
>>
>> a wireless communications component;
>>
>> a processor in communication with the wireless communications component and the sensor package;
>>
>> a memory in communication with the processor, the memory configured to store sensor data provided by the sensor package and computer readable instructions which are executable by the processor; wherein the computer readable instructions are programmed to:
>>
>>> *receive a wake-up command* from a second automation component;
>>>
>>> *communicate stored sensor data* related to the sensor data in control at a second automation component; and
>>>
>>> *receive a power-down command* from the second automation component.

'282 patent, claim 13 (emphasis added).

The '282 patent acknowledges that all of the components recited in claim 13 were well known and conventional at the time.  For example, the patent explains that a "multi-sensor package" is just a package of conventional sensors that "may" be configured to detect various possible "variables" ("for example, temperature, humidity, carbon dioxide, carbon monoxide, volatile organic compounds, etc.").  *See id.*, 6:22-39.  The patent does not describe any specific structure, functionality or configuration required for the recited "package," nor provide any description of novelty over existing sensor packages, or indication that the sensor package is used in any non-conventional way.  *See id.*; *see also, e.g.*, *id.*, 2:31-35; 6:46-51; 8:65-9:1; 9:44-47; 10:17-29; Fig. 2.  The '282 patent similarly describes the remaining hardware recited in the claim

as generic and conventional.  *See, e.g.*, *id.*, 3:52-4:46 (describing "example" conventional wireless communications components, which are "not intended to limit the type, functionality and interoperability of the devices … claimed herein"); 5:57-62 (describing conventional processors "such as an INTEL® PENTIUM, an AMD® ATHLON™, an Atmel® ATMega, or other 8, 12, 16, 24, 32 or 64 bit classes of processors"); 5:62-66 (describing conventional types of memory, including "any other known or contemplated storage device or mechanism").

As illustrated above, stripped of its generic and conventional components, claim 13 merely recites the abstract idea of receiving an information request and communicating information in response to the request.  That it is implemented in a particular technological environment cannot alone confer eligibility.

### 2.    The '887 Patent

The '887 patent (ECF No. 1-3) was filed on April 12, 2006.  The '887 patent purports to have invented a method and system for "remote monitoring of conditions."  *See* '887 patent, 1:6-8.  The Background section of the '887 patent acknowledges that known automation systems existed that included "one or more distributed components" for "automating a process control." *Id.*, 1:9-11.  This includes components for, among other things, "heating, ventilation, [and] air conditioning (HVAC)," where the components "may communicate information … by wirelessly broadcasting information between and among the components."  *Id.*, 1:11-19.  Notably, the patent admits that in these conventional systems, "[t]he components may detect events, sense conditions, respond to detected events or changes in conditions, and/or control operation of other devices." *Id.*, 1:20-33.  According to the patent, wireless networks are "limited by the amount of available bandwidth," and there is a need for a "system for reducing an amount of communication over a wireless automated system" that uses "dynamic value reporting."  *Id.*, 1:1:34-35, 1:46-49.

The '887 patent purports to address this issue through its disclosed automation device. However, the disclosed device simply uses conventional components for their intended purposes, and does not disclose any new device design or structure that could transform the claimed abstract idea into patentable technology.  This is illustrated in claim 1 below (the only '887 patent claim identified in Ollnova's complaint):

1. A wireless automation device, comprising:

a transceiver operable to wirelessly communicate packets of information over a wireless network;

a sensor operable to generate a indicator for a sensed condition;

a controller configured to poll the sensor at a polling interval to read the indicator during a current period of the polling interval and to selectively operate the transceiver to communicate information associated reading of the indicator; and

a memory, the controller storing a reading of the indicator during the current period in the memory, where the memory stores at least one prior reading of the indicator, the prior reading of the indicator made during a prior period of the polling interval,

wherein the transceiver is configured to ***transmit a most recent reading*** of the indicator stored in the memory during a period of a transmission interval ***in response to detecting a change in the sensed condition outside a predetermined range*** and wherein ***transmission of the most recent reading*** of the indicator stored in the memory during the period of the transmission interval ***is suspended in response to detecting a change in the sensed condition within the predetermined range***.

'887 patent, claim 1 (emphasis added).

The '887 patent acknowledges that all of the components recited in claim 1 were well known and conventional at the time.  For example, the patent explains that the recited "transceiver" can generally be any "RF transceiver, RF transmitter, and/or RF receiver ***or other device*** that wirelessly communicates packets of information over a wireless network."  *Id.*, 2:8-11 (emphasis added); *see also id.*, 8:16-45.  The "controller" is generically described as any device that receives information and generates control signals.  *See id.*, 1:23-26; 4:33-36; 13:36-55 ("Additional,

different or fewer components of the controller 508 may be provided ….").  The "memory" is generically described as a medium for storing information.  *See id.*, 7:30-41.

Stripped of its generic and conventional components, claim 1 merely recites the abstract idea of communicating information if a notable change is detected, or not communicating information if a notable change is not detected.

### 3.      The '495 Patent

The '495 patent (ECF No. 1-5) was filed on August 9, 2004.  The '495 patent purports to have invented a wireless building control architecture for automation of building systems.  *See* '495 patent, 1:6-8.  The Background section of the '495 patent acknowledges that known building automation systems include HVAC systems that "are typically formed from distributed components wired together."  *Id.*, 1:9-15.  The patent further explains that "wireless architectures for building automation systems have been proposed," where, for example, a "controller wirelessly communicates with sensors and associated actuators," where components may communicate on different networks.  *Id.*, 1:53-2:2.  The '495 patent purports to improve on the existing systems with a wireless architecture that allegedly "maximizes control capabilities and optional or available control paths," but in reality it simply describes known conventional networks used for their intended purposes to carry out an abstract idea.  This is illustrated in claim 1 below (the only '495 patent claim identified in Ollnova's complaint):

> 1. A control system for wireless building automation control, the control system comprising:
>
> a first wireless network in a building having first wireless communications protocol; and
>
> a second wireless network in the building having a second wireless communications protocol, the first wireless communications protocol different than the second wireless communications protocol;
>
> wherein the first wireless network is operable to **control**, free of communications with the second wireless network, **building components in response to sensors**

> *operable within the first wireless network*, and wherein the first wireless network is also operable to *control the building components in response to data from the second wireless network*.

'495 patent, claim 1 (emphasis added).

The '495 patent acknowledges that all of the components recited in claim 1 were well known and conventional at the time.  For example, with respect to the first and second wireless networks, the patent describes the use of well-known existing networks (or any network that might be developed in the future):

> Each network operates pursuant to different wireless communications protocols. For example, the lower level network 14 operates pursuant to the 802.15.4 communications protocols, but Bluetooth, proprietary, standard, *now known or later developed wireless communication protocols may be used*. The high level network 14 operates pursuant to the 802.11x protocol (e.g., 802.11a 802.11b, 802.11c . . . 802.11g), but wifi, computer network, Ethernet, proprietary, standard, *now known or later developed protocols may be used*. 802.15.4 and 802.11x provide medium access control and a physical interface to wireless medium. *Any now known or later developed network and transport algorithms may be used*. Communication, transport and routing algorithms are provided on the appropriate devices. Any packet size or data format may be used.

*Id.*, 5:8-22 (emphasis added).  Similarly, the patent generally describes "sensors" as any "now known or later developed sensors," and provides some examples of conventional sensors.  *Id.*, 6:53-60.  The term "building components" is itself generic, and the patent generally refers to the use of any components in a building, existing or otherwise.  *See id.*, 12:56-61 ("Peak demand limiting is used to control an overall power usage by a building, such as controlling power used by chillers, boilers, air handlers, lighting, *or other building components*." (emphasis added)).

Stripped of its generic and conventional components, claim 1 merely recites the abstract idea of controlling generic "components" using information from two separate sources.

### 4.    The '371 Patent

The '371 patent (ECF No. 1-7) was filed on January 3, 2008.  The '371 patent purports to have invented a method and device for communicating "change-of-value information" within a

8

building automation system.  *See* '371 patent, 1:8-12.  The Background section of the '371 patent acknowledges that known building automation systems "integrate[d] and control[led] elements and services within a structure" such as an HVAC system, where "controllers may, in turn, be configured to receive an input from a sensor or other device."  *Id.*, 1:13-29.  The patent further explains that it was known for information "such as the temperature indication" to be sent to one or more controllers which may then communicate that information to a network, where system monitoring and control can take place.  *Id.*, 1:36-55.  The patent explains that it was known to use "[w]ireless devices" in this type of system, which can communicate with each other and perform specific tasks.  *See id.*, 1:56-2:6.  The '371 patent similarly purports to disclose a system "for communicating information between wireless devices and/or automation components within a building automation system," *id.*, 2:18-21, but like the other Asserted Patents, it simply describes the use of conventional components to carry out an abstract idea.  This is illustrated in claim 13 below (the only '371 patent claim identified in Ollnova's complaint):

> 13. An automation component configured for wireless communication within a building automation system, the automation component comprising:
>
> a wireless communications component;
>
> a processor in communication with the wireless communications component;
>
> a memory in communication with the processor, the memory configured to store computer readable instructions which are executable by the processor;
>
> wherein the computer readable instructions are programmed to:
>
> > ***receive at least one change-of-value update*** via the wireless communications component, wherein the change-of-value update includes a plurality of change-of-value messages received from a plurality of devices;
> >
> > ***storing the at least one change-of-value update*** corresponding to at least one wireless device; and
> >
> > ***communicate the at least one change-of-value update in response to a polling request*** and ***repeat the at least one change-of-value update at regular intervals*** according to a schedule or until a change-of value acknowledgment is received.

'371 patent, claim 13 (emphasis added).

The '371 patent acknowledges that all of the components recited in claim 13 were well known and conventional at the time.  For example, like the '282 patent, the '371 patent describes "example" conventional wireless communications components, which are "not intended to limit the type, functionality and interoperability of the devices … claimed herein." *Id.*, 3:26-4:21.  The specification also describes various examples of conventional "processor" and "memory" components that can be used to practice the claims when used in a conventional manner.  *See id.*, 5:32-41.  With respect to the recited "change-of-value update," the '371 patent explains that this term merely refers to some indication that "denotes that the information, setting, signals and/or indications stored within the memory 204 have been altered, updated or otherwise changed." *Id.*, 6:10-17.  Notably, the patent does not describe, limit or otherwise suggest that the "change-of-value update" is a unique or novel type of data of any particular structure or composition, and instead simply describes a notification, albeit in a generic computerized environment.

Stripped of its generic and conventional components, claim 1 merely recites the abstract idea of receiving information about a change, storing that information, and then communicating that information upon request until receipt has been acknowledged.

## IV.  LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); Fed. R. Civ. P. 12(b)(6).  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

10

Patent eligibility can be decided on a motion to dismiss "when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018); *see also SAP*, 898 F.3d at 1166; *Bilski v. Kappos*, 561 U.S. 593, 602 (2010).  Accordingly, the § 101 inquiry is properly raised at the pleadings stage where it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter.  *See Ultramercial, Inc. v. Hulu*, *LLC*, 772 F.3d 709, 718-19 (Fed. Cir. 2014) (Mayer, J., concurring).  In those situations, claim construction is not required.  *Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101.").

Determining whether claims are patent-eligible involves a two-step inquiry.  <u>First</u>, the court determines "whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea.  *Alice*, 134 S. Ct. at 2355.  This inquiry "looks at the 'focus' of the claims, and their 'character as a whole.'"  *In re Rosenberg*, 813 F. App'x 594, 596 (Fed. Cir. 2020).  <u>Second</u>, if the claims are directed to an abstract idea, the court evaluates whether there is an "inventive concept"—*i.e.*, whether an element or combination of elements in the claim is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.  *Alice*, 134 S. Ct. at 2355.  Any limitations or other additional features "must be more than 'well-understood, routine, conventional activity.'"  *Affinity*, 838 F.3d at 1262.

If the subject matter of a claim could be performed in the human mind, or by a human using pen and paper, it is not patent-eligible.  *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011).  Furthermore, a claim is not meaningfully limited if it includes only token or insignificant pre- or post-solution activity—such as identifying a relevant audience,

11

category of use, field of use, or technological environment.  *Bilski*, 561 U.S. at 610; *Diamond v. Diehr*, 450 U.S. 175, 191-92 & n.14 (1981); *Parker v. Flook*, 437 U.S. 584, 595 n.18 (1978). "[S]imply appending conventional steps, specified at a high level of generality, to ... abstract ideas cannot make those ... ideas patentable." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1297-98, 1300 (2012).

## V.   ARGUMENT

The claims of the Asserted Patents are invalid under § 101 because they fail both prongs of the *Alice* test.  Each claim is directed to an abstract idea and contains no "inventive concept."

### A.   The Claims Identified in the Complaint Are Representative

Where claims are "substantially similar and linked to the same abstract idea," courts may look to representative claims in a § 101 analysis. *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *see also Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*, No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938, at *8-9 (E.D. Tex. Mar. 8, 2017), *report and recommendation adopted*, 2017 WL 1177988 (Mar. 30, 2017) (invalidating 974 claims after analyzing only a few "representative claims" where other claims were "substantially similar" and "linked to the same abstract idea").  Here, the Asserted Patent claims identified in Ollnova's complaint—i.e., '282 patent claim 13, '887 patent claim 1, '495 patent claim 1, and '371 patent claim 13 (collectively, the "Representative Claims")—are representative of all claims in their respective patents, as the remaining claims recite the same abstract idea, with immaterial and conventional variations.

With respect to the '282 patent, independent claims 1, 7 and 30 recite nearly the same subject matter with minor variations for purposes of the § 101 analysis.  Claim 1 recites the same "automation component" but describes communicating "sensor control information," which the patent generally refers to as information concerning "which sensor and sensor data is currently

being analyzed and/or is primary or controlling the field panel" (i.e., what information is being requested), with no particular requirements concerning the manner, type or structure of such information. *See* '282 patent, 9:9-22. Claim 7 likewise recites communicating "status data," which the patent generally describes as information concerning the status of a sensor (i.e., what is the current information), again with no particular requirements concerning the manner, type or structure of such information. *See id.*, 9:55-60; Fig. 7. Claim 20 is a method claim that simply describes the communication of changes within sensor data (i.e., what has changed), where the patent does not define or limit what may or may not qualify as "sensor data" (other than data from conventional sensors). The same is true for the dependent claims. For example, claims 2, 8 and 14 refer to various possibly sensors that the patent describes as conventional. Claims 3, 9, 15 and 21 refer to a "change-of-value threshold," which the patent simply describes as a general indicator that information has been "altered, updated or otherwise changed." *Id.*, 6:30-37. Claims 4, 10 and 16 refer to an "identification flag" for sensor values, which, while not defined in the patent, at least corresponds to other "flags" that merely serve as indicators (i.e., notifications that something exists). *See, e.g.*, *id.* The remaining dependent claims refer to when and where information is communicated using the conventional system components in the intended manner, i.e., to communicate some or all information wirelessly as needed (as described in patent's own Background section). Notably, there are no specific instructions or limitations in the patent concerning how these claim limitations must be carried out, other than a description of the idea, non-specific examples of how the idea "may" be carried out, and the instruction to "apply it" to the conventional technological environment. *See Alice*, 134 S. Ct. at 2357.

With respect to the '887 patent, the remaining dependent claims describe various ways to select or limit the information being communicated (e.g., using "upper" and "lower" limits, using

some undefined "statistical analysis," using a "counter"), all of which are known functions of the conventional components described in the specification, as there is no indication or description of any non-conventional sensors or related components, much less a description of how one would specifically alter or program a device to perform the claim limitations in a non-conventional manner.  Indeed, the patent describes all of the recited hardware as including generic and conventional components (*see supra* at Section III.B.2.), and therefore the recited limitations describe conventional ways to use such components.  *See, e.g.*, '887 patent, 13:56-14:39 (describing using a conventional processor "now known or later developed for monitoring, controlling and/or routing," and a controller that processes information "according to a control algorithm for the system and for the device," without defining or limiting such algorithm).

With respect to the '495 patent, like claim 1, independent claim 16 recites a method using conventional wireless networks to communicate information in the intended manner of operation, and further describes using that information to control "building actuator outputs," which the patent describes "actuator" as including "a damper, heating element, cooling element or other actuator" (i.e., conventional HVAC equipment or the like).  *See* '495 patent, 1:15-20.  Independent claim 29 similarly recites use of conventional wireless networks to control conventional building equipment, and further references some undefined "control algorithm," which is an unbounded term that is not described or limited in any meaningful way in the claims or specification, and therefore cannot describe a technological innovation.  Indeed, the patent itself acknowledges that "control algorithm[s]" are "specific to the actuator" (*id.*, 8:62-66), and thus the patent's contemplated use of conventional actuators (e.g., HVAC equipment or the like) indicates that "control algorithm," while vague and undefined, must include conventional algorithms provided with such conventional actuators, as the claims do not require any specific or unique programming.

*See id.*, 3:15-23; 8:26-9:5.  Independent claim 31 is a method claim that recites the same generic and conventional elements discussed above.  The remaining dependent claims describe various conventional aspects and uses for the recited components, such as, e.g., networks that have certain bandwidths, use of networks to control or assign control over processes (including in particular areas of a building), and use of communicated information to "compare" values and identify failures.  The patent does not purport to have invented these concepts, nor does it disclose any specific manner or way that the recited conventional components would need to be altered or reprogrammed in order to carry out these concepts, beyond simply describing the idea of using conventional components to communicate information in this manner.

With respect to the '371 patent, independent claim 1 is largely the same as claim 13, with the added step of processing a "change-of-value request" to generate the "change-of-value update" which, like the "change-of-value update" in claim 13, is simply a request for an indication as to whether any information has been "changed or altered."  *See* '371 patent, 6:39-49.  Independent claims 8 and 17 are method claims reciting the same ideas claimed in claims 1 and 13, albeit in method form.  The remaining dependent claims again describe various conventional aspects and uses for the recited components, such as, e.g., communicating information wirelessly, using particular conventional devices, including device-identifying information, and communicating information "automatically," all of which do not change the abstract nature of the subject matter claimed.

Thus, the Representative Claims are representative for purposes of the § 101 analysis, and any differences are insubstantial with respect to eligibility, as each are drawn to the same abstract idea and merely recite token post-solution elements performed by "purely conventional" computing elements, or merely requiring "a generic computer to perform generic computer

functions," as demonstrated by the patents themselves describing the recited elements as including conventional components and functionalities.  *Alice*, 573 U.S. at 225; *see also Content Extraction*, 776 F.3d at 1348 (finding claims representative of remaining claims, and explaining that plaintiff should have "differentiated any claim from those identified as representative" if it believed otherwise).

### B.     *Alice* Step 1: The Representative Claims Are Directed to Abstract Ideas

The Representative Claims are directed to unpatentable, abstract ideas they claim nothing more than the "longstanding," "routine," and "conventional" concepts of storing and communicating information from one location to another in response to an event or request. *See Alice*, 134 S. Ct. at 2356; *Bilski*, 561 U.S. at 611; *see also Repifi Vendor Logistics v. IntelliCentrics, Inc.*, No. 21-1906, 2022 WL 794981, at *2 (Fed. Cir. Mar. 15, 2022) (finding claims failed *Alice* step 1 where they were directed to "a well-established business practice, a method for organizing human activity, and an abstract idea").

For example, claim 13 of the '282 patent recites the abstract idea of receiving a request for information from a source, communicating information in response to the request, and then ending the communication.  This type of subject matter represents the classic abstract idea that can be performed in the human mind, or by a human using pen and paper.  *CyberSource*, 654 F.3d at 1372.  For example, the same process could be carried out by one person ("a second automation component") calling a friend to ask about the weather ("receive a wake-up command"), receive the requested information from the friend who knows the current weather ("communicate stored sensor data"), and then letting the friend know nothing else is needed ("receive a power-down command").  This abstract idea of communicating observational information is an ancient concept, and the mere implementation of it using conventional sensors, processors and memory does not make it any less abstract.  *See Alice*, 573 U.S. at 225; *Intellectual Ventures I LLC v. Symantec*

*Corp.*, 838 F.3d 1307, 1315 (Fed. Cir 2016) ("Claims that 'amount to nothing significantly more than an instruction to apply [an] abstract idea ... using some unspecified, generic computer' and in which 'each step does no more than require a generic computer to perform generic computer functions' do not make an abstract idea patent-eligible") (citation omitted).

Claim 1 of the '887 patent recites the abstract idea of communicating information if a change in conditions is detected within a predetermined criteria, or not communicating information if the change is not within the predetermined criteria.  Again, this basic concept can be performed in the human mind, or by a human using pen and paper.  For example, one person may call a friend and ask that the friend let them know if the outdoor temperature drops below 70º F, so the person knows whether they may need a coat.  If the temperature does drop below 70º F, the friend may call the person and let them know ("transmit a most recent reading of the indicator … in response to detecting a change in the sensed condition outside a predetermined range").  If the friend sees that the temperature stays above 70º F, then the friend need not call the person with any updates on the weather ("transmission of the most recent reading … is suspended in response to detecting a change in the sensed condition within the predetermined range").  The claims merely apply this abstract idea to a conventional computerized environment, where the recited transceiver, sensor, memory and network are described by the patent itself as conventional, and operating in a conventional manner.

Claim 1 of the '495 patent recites the abstract idea of controlling generic "components" using information from two separate sources (i.e., information from two separate networks).  This process could be carried out, for example, by one person adjusting the temperature in a room ("control … building components") based on their own comfort level ("in response to sensors operatable within the first wireless network," and "free of communications with the second

wireless network"), as well as based on how comfortable a friend in the same room says he or she is ("in response to data from the second wireless network"). The friend could alternatively request use of a fan to control the temperature, while the person chooses to open or close a window to adjust their comfort. There are any number of scenarios in which this abstract idea could be carried out, and the claims do not require any particular network type or design, or any particular type of control over building components that cannot be carried out by a person. The use of conventional networks and components underscores the abstract nature of the claim, and the lack of any actual technological improvement. *See buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification" does not make the claim patent-eligible.).

Claim 13 of the '371 patent recites the abstract idea of receiving information about a change, storing that information, and then communicating that information upon request until receipt of the information has been acknowledged. Like the claims discussed above, this process could be carried out by people without any hardware components. For example, a person may look at thermostat and humidity sensor devices and notice that the temperature and humidity in their house has changed ("receive at least one change-of-value update [that] includes a plurality of change-of-value messages received from a plurality of devices"). That person may write down the new temperature and humidity readings ("storing the at least one change-of-value update"), and when a friend leaves a message with the person asking what the temperature and humidity in the house are like ("polling request"), the person can repeatedly attempt to contact the friend to give them the recorded readings until the friend acknowledges receipt ("communicate the at least one change-of-value update … at regular intervals … until a … acknowledgment is received"). The

claim simply applies this idea to a conventional computerized environment, with no technological limitations beyond the use of admittedly conventional components.

Indeed, the Federal Circuit has consistently held that the steps of gathering, storing, analyzing, and communicating information—alone, or in combination—are abstract ideas.  *See, e.g.*, *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("gathering and analyzing information of a specified content, then displaying the results" is abstract); *MyMail, Ltd. v. ooVoo, LLC*, No. 2020-1825, 2021 WL 3671364, at *5 (Fed. Cir. Aug. 19, 2021) ("updating toolbar software over a network without user intervention" based on "collected information"); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340-42 (Fed. Cir. 2017) ("collecting, displaying, and manipulating data" is abstract); *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) ("functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records'" are abstract); *Affinity Labs*, 838 F.3d at 1258-59 ("wirelessly communicating regional broadcast content to an out-of-region recipient" is abstract); *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2017) ("collecting, analyzing, manipulating, and displaying data" is abstract); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016) ("collecting information, including when limited to particular content" is abstract); *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1344 (Fed. Cir. 2018) ("collecting, analyzing, and displaying that information, without more, is an abstract idea").

For example, in *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, the Federal Circuit addressed a patent claiming similar subject matter relating to wirelessly communicating information upon request within a system—in that case, "a network-based media system …, in which the system delivers streaming content from a network-based resource upon demand to a

handheld wireless electronic device"—and found the claims were invalid for being directed to the abstract idea of "delivering selectable media content and subsequently playing the selected content on a portable device." 838 F.3d 1266, 1268, 1272 (Fed. Cir. 2016).  Similarly, in *Electric Power Group, LLC v. Alstom S.A.*, the Federal Circuit concluded that "collecting information," "analyzing information," and "presenting the results" are all "within the realm of abstract ideas," and "the combination of those abstract-idea processes" is "an abstract idea" as well.  830 F.3d at 1353-54. In doing so, the Court reasoned that the claims did not provide "computer-functionality improvements," but instead, they used "existing computers as tools in aid of processes focused on abstract ideas." *Id.* at 1354 (internal quotation omitted).

The same is true here.  Like the claims in *Affinity* and *Electric Power*, the Representative Claims are abstract because they do not provide any improvement to computer-functionality, and instead recite basic steps of receiving, communicating, transmitting, controlling and storing information, while carrying out these actions using conventional components arranged in a conventional manner, and used in conventional ways.  However, "limiting the claims to [a] particular technological environment ... is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core." *Elec. Power Grp*, 830 F.3d at 1354. Furthermore, the Court need not conduct a detailed analysis to determine whether the claimed components or their arrangements and functionality are conventional, as the patents themselves make that fact abundantly clear.  *See supra* at Section III.B.

The Representative Claims are far different from the types of claims that the Federal Circuit has held to be eligible, which typically disclose specific means for improving specific computer technology itself, or solving specific computer problems. For example, in *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343 (Fed. Cir. 2018), the Federal Circuit found claims directed to

verifying computer software eligible and stated: "[i]mproving security—here, against a computer's unauthorized use of a program—can be a non-abstract computer-functionality improvement ... done by a specific technique that departs from earlier approaches to solve a specific computer problem." *Id.* at 1348. The court further noted that "[t]he claimed method ... specifically identifies how that functionality improvement is effectuated in an assertedly unexpected way." *Id.* Similarly, in *Mentone Solutions LLC v. Digi International Inc.*, the Federal Circuit found that claims directed to dynamic resource allocation were patent-eligible, because they "add[] [a] capability" to existing systems that did not previously exist, and "solve[d] a challenge unique to computer networks" by providing a detailed solution grounded in the network technology itself. *See id.*, No. 21-1202, 2021 WL 5291802, at *3-5 (Fed. Cir. Nov. 15, 2021). The same is not true of the Representative Claims, which do not require a specific or unconventional technique, nor do they identify any specific improvement to computer or network functionality, much less an unexpected way of effecting such an improvement. Accordingly, the Representative Claims fail *Alice* step one. *See Alice*, 134 S. Ct. at 2355.

### C.    *Alice* Step 2: The Representative Claims Contain No Inventive Concept to Transform the Abstract Ideas into Patent-Eligible Subject Matter

Because the Representative Claims are directed to abstract ideas, the Court must next determine whether they contain an "inventive concept sufficient to transform the claimed abstract idea into a patent eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotations omitted). To pass this test, the claims "must include additional features" that "must be more than well-understood, routine, conventional activity." *Ultramercial*, 772 F.3d at 715 (quotation omitted). Here, the Representative Claims are broadly generic and do not contain meaningful limitations that would restrict it to a non-routine, specific application of the abstract idea.

The abstract steps of receiving, communicating, transmitting, controlling and storing information cannot themselves supply an inventive concept sufficient to salvage the claim. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept."). Each of these basic functions can be performed by any conventional hardware component already disclosed as prior art in the Asserted Patents. Indeed, the Asserted Patents admit that no new or specially-programmed hardware is needed. *See supra* at Section III.B; *see CardioNet, LLC v. InfoBionic, Inc.*, No. 20-2123, 2021 WL 5024388, at *5-6 (Fed. Cir. Oct. 29, 2021) (finding no inventive concept where "the specification explains that the other claimed components are conventional," and those components were used to "perform[] basic functions"). The hardware components in Representative Claims cannot plausibly provide an inventive concept here because each recited component—"sensors" or a "multi-sensor package," "wireless communication components," "processor," "memory," "controller," "networks," "building components"—is already admitted to be conventional in the background of the Asserted Patents, as discussed above. *See MyMail*, 2021 WL 3671364, at *7 (finding no inventive concept where "the individual claim elements are either generic computer components or routine activity," such as "a user Internet device," "a server" and "a toolbar"). Similarly, the basic concept of communicating information "wirelessly" cannot supply the inventive concept. *See, e.g.*, *Affinity*, 838 F.3d at 1258-60 (finding "wirelessly communicating" information found patent ineligible); *Chamberlain*, 935 F.3d at 1346-47 ("[w]irelessly communicating status information about a system" found patent ineligible). Nor can the combination of multiple conventional components and functionality in the claims serve to confer eligibility. *See Universal Secure Registry LLC v. Apple Inc.,* 10 F.4th 1342, 1355 (Fed. Cir.

2021) (finding the claimed "combination of [] long-standing conventional methods of authentication yielded expected results of an additive increase in security," and nothing in the record suggested an additional technological improvement).  At most, the claims "merely recite the use of conventional abilities of [] conventional" components, which cannot confer eligibility. *Repifi*, 2022 WL 794981, at *3.

Moreover, there is nothing in the "ordered combination" of components in the claims that could supply an adequate inventive concept.  As the patent specifications make clear, each recited component is arranged and used in a conventional manner—e.g., the conventional sensors are used to sense conditions, the conventional processors are used to process information, the conventional memories are used to store information, the conventional networks are used to communicate information.  *See supra* at Section III.B.  While the patents refer to perceived problems with prior art systems, such as operating for extended periods on a limited battery charge, or using limited bandwidth (*see id.*), nothing in the claims provides an actual technological solution to these issues that changes the conventional nature of the recited components and their arrangement.  Indeed, the claims just direct the use of conventional components in an intended manner to communicate and use certain observable information.  While the claims use conventional components to carry out the abstract ideas without human involvement, "automation of a long-standing human process cannot be the inventive concept because such automation is itself an abstract idea."  *Repifi*, 2022 WL 794981, at *3 (citing *ChargePoint, Inc. v. Sema-Connect, Inc.*, 920 F.3d 759, 774 (Fed. Cir. 2019)).

The Representative Claims bear no resemblance to those claims held by the Federal Circuit to provide an inventive concept.  For example, in *Enfish, LLC v. Microsoft Corp.*, the Federal Circuit distinguished the claims from others that "simply add[ed] conventional computer components to

well-known business practices," finding that they were instead "directed to a specific improvement to the way computers operate."  822 F.3d 1336-38 (Fed. Cir. 2016).  In particular, the specific non-conventional structure of the recited database resulted in "increased flexibility, faster search times, and smaller memory requirements." *Id.* at 1337.  Unlike *Enfish*, nothing in the Representative Claims requires or describes any non-conventional components or architecture that could amount to a specific improvement to the way recited components ***themselves*** operate (nor could they, as the claims specifically contemplate use of conventional components in a conventional manner).

In *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, the Federal Circuit held that the claimed invention was patentable because, while the elements individually required "arguably generic components," they involved an "unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases)" and "depend[ed] upon the invention's ***unique distributed architecture***."  841 F.3d 1288, 1300-03 (Fed. Cir. 2016) (emphasis added); *see also BASCOM*, 827 F.3d at 1350 (holding that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces" to provide a technology-based solution).  Unlike *Amdocs* and *BASCOM*, the Representative Claims do not solve a technological problem or present a technological solution or technical improvement, as again demonstrated by their use of purely conventional components to provide their generic functionality.  They instead merely "attempt[]" to limit" their abstract ideas "to a particular technological environment," which cannot confer patentability.  *Mayo*, 132 S. Ct. at 1297.

Consequently, the Representative Claims (and all other claims in the Asserted Patents) are not patent eligible.

**D.     There Are No Claim Construction or Factual Disputes Preventing the Court from Ruling on These Issues at the Rule 12 Stage**

The issue of patent eligibility is ripe for the Court's consideration because there are no legitimate factual or claim construction issues precluding resolution on the pleadings.  *See Health Discovery Corp. v. Intel Corp.*, No. 6:20-cv-00666-ADA, 2021 WL 6116891, *3-4, 13 (W.D. Tex. Dec. 27, 2021) (finding claims ineligible at the pleadings stage where no factual disputes were raised).  This case is markedly different from *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018), and the line of cases where factual issues have been found to exist in *Alice* Step 2.  In *Berkheimer*, the Federal Circuit noted that the specification explicitly "describe[d] an inventive feature that store[d] parsed data in a purportedly unconventional manner."  881 F.3d at 1369. The court added that "[t]he improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities ... so we must analyze the asserted claims and determine whether they capture these improvements."  *Id.*  Here, Ollnova cannot offer a plausible claim construction that would materially affect the eligibility analysis.[3]

The Representative Claims recite only generic components and basic information storage and communication steps, neither of which require construction to address the eligibility issue. *See Multimedia Plus, Inc. v. Playerlync, LLC*, 198 F. Supp. 3d 264, 267 (S.D.N.Y. 2016), *aff'd*, 695 F. App'x 577 (Fed. Cir. 2017) ("Where the claims of the patent are straightforward and no components are opaque such that claim construction would be necessary to flush out its contours,

---

[3]  Notably, during the meet and confer pursuant to Your Honor's Standing Order, counsel for Plaintiff did not identify any claim terms that would require construction in order to conduct the eligibility analysis.

claim construction is not necessary to reveal any material legal issues and would not be a wise use of judicial resources.") (internal citations omitted).

Furthermore, "[t]he *Berkheimer* [] cases do not stand for the proposition that a plaintiff can avoid dismissal simply by reciting in the complaint that the invention at issue is novel and that the inventive concept resides in the abstract idea itself." *First-Class Monitoring, LLC v. Ups of Am., Inc.*, 389 F. Supp. 3d 456, 471 (E.D. Tex. 2019). "Any allegation about inventiveness, wholly divorced from the claims or the specification, does not defeat a motion to dismiss; only plausible and specific factual allegations that aspects of the claims are inventive are sufficient." *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) (internal quotations omitted). Here, there is simply nothing in the claims that could create an issue for claim construction or discovery.

## VI.   CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss Ollnova's Complaint in its entirety.

Dated: April 11, 2022

Respectfully submitted,

*/s/ Jennifer Parker Ainsworth*
Jennifer Parker Ainsworth
TX Bar No. 00784720
WILSON, ROBERTSON &
    CORNELIUS, P.C.
909 ESE Loop 323, Suite 400
Tyler, Texas 75701
Telephone: (903) 509-5000
Facsimile: (903) 509-5092
Email: jainsworth@wilsonlawfirm.com

Timothy J. Carroll
VENABLE LLP
227 W Monroe St, Suite 3950
Chicago, IL 60606
Telephone: (312) 820-3400
Facsimile: (312) 820-3401
Email: TJCarroll@Venable.com

Jason M. Dorsky
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: (202) 344-8300
Email: JMDorsky@Venable.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email and/or fax, on this the 11th day of April, 2022.

*/s/ Jennifer P. Ainsworth*
Jennifer P. Ainsworth

**CERTIFICATE OF COMPLIANCE WITH THE COURT'S**
**35 U.S.C. § 101 MOTION PRACTICE ORDER**

__X__The Parties **agree** that prior claim construction is not needed to inform the Court's analysis as to patentability.[4]

_____The Parties **disagree** on whether prior claim construction is not needed to inform the Court's analysis as to patentability.

*/s/ Jennifer P. Ainsworth*
Jennifer P. Ainsworth

---

[4]  During the meet and confer pursuant to Your Honor's Standing Order, counsel for Plaintiff agreed that claim construction was not required, but reserved the right to identify claim construction issues at a later date after reviewing Defendant's Motion.