**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

OLLNOVA TECHNOLOGIES LTD.,

    *Plaintiff*,

    v.

ECOBEE TECHNOLOGIES ULC d/b/a
ECOBEE,

    *Defendant*.

Case No. 2:22-cv-00072-JRG

The Honorable J. Rodney Gilstrap

████████████████████

## DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OF NO DAMAGES OR, IN THE ALTERNATIVE, FOR A NEW TRIAL REGARDING DAMAGES

## TABLE OF CONTENTS

I.    Introduction ............................................................................................................. 1

II.   Statement of Facts .................................................................................................. 1

    A.    Ollnova's Theories of Infringement Were Based on Precise and Specific Product Configurations ..................................................................... 2

    B.    Ollnova's Overbroad Damages Theories Are Not Tailored to its Precise and Specific Infringement Theories ............................................... 2

        1.    Ollnova's Income Approach ................................................................. 3

        2.    Ollnova's Market Approach ................................................................. 5

        3.    Ollnova's Improper Inclusion of Pre-Suit Sales in the Royalty Base........ 5

    C.    The Jury's Verdict; Invalidation of '282 Patent .................................... 6

III.  Argument ................................................................................................................ 7

    A.    Income Approach: Ollnova Failed to Tie its Royalty Base to Infringing Acts ......................................................................................... 7

        1.    Mr. Bergman Improperly Tied His Royalty Base to *Invalid* Claims.......... 7

        2.    Mr. Bergman Did *Not* Tie His Royalty Base to Infringing Configurations................................................................................... 9

    B.    Market Approach: Ollnova's Reliance on a Non-Comparable Agreement Failed to Apportion Value between Patents-in-Suit and Unasserted Patents ....... 10

    C.    Ollnova Improperly Included Pre-Complaint Sales in its Damages Proposals ................................................................................................. 13

IV.   Conclusion ........................................................................................................... 15

## **TABLE OF AUTHORITIES**

**Cases**

*Apple Inc. v. Wi-Lan Inc.*,
  25 F.4th 960(Fed. Cir. 2022) ........................................................................... 10

*Arctic Cat Inc. v. Bombardier Rec. Prods. Inc.*,
  876 F.3d 1350 (Fed. Cir. 2017)........................................................................ 14

*Avago Techs. Gen. IP (Singapore) Pte Ltd. v. Asustek Comp., Inc.*,
  No. 15-cv-04525-EMC, D.I. 395 (N.D. Cal. Nov. 9, 2016) ............................. 11

*Convolve, Inc. v. Dell, Inc.*,
  No. 2:08-CV-244-CE, 2011 WL 13090123 (E.D. Tex. July 8, 2011)............................ 13

*Enplas Display Device Corp. v. Seoul Semi Co., Ltd.*,
  909 F.3d 398 (Fed. Cir. 2018)........................................................................... 10

*Golden Bridge Tech. v. Apple Inc.*,
  No. 5:12-CV-04882-PSG, 2014 WL 2194501 (N.D. Cal. May 18, 2014) ...................... 11

*In re Koninklijke Philips Patent Litig.*,
  No. 18-cv-01885-HSG, 2020 WL 7398647 (N.D. Cal. Apr. 13, 2020) ........................ 11

*Innovative Memory Sys., Inc. v. Micron Tech., Inc.*,
  C.A. No. 14-1480-RGA, 2022 WL 4548644 (D. Del. Sept. 29, 2022) .................... 14, 15

*LaserDynamics, Inc. v. Quanta Comp., Inc.*,
  No. 2:06-CV-348, 2011 WL 7563818 (E.D. Tex. Jan. 7, 2011) ...................... 12

*Limelight Networks, Inc. v. XO Comm's, LLC*,
  No. 3:15-cv-720-JAG, 2018 WL 678245 (E.D.V.A. Feb. 2, 2018) ................. 12

*Looksmart Grp., Inc. v. Microsoft Corp.*,
  No. 17-cv-04709, 2019 WL 4009263 (N.D. Cal. Aug. 5, 2019) ..................... 10

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009).............................................................. 7, 9, 10

*Memphis Cmty. Sch. Dist. v. Stachura*,
  477 U.S. 299 (1986).......................................................................................... 6

*Microchip Tech. Inc. v. Aptiv Servs. US LLC*,
  No. 1:17-CV-01194, 2020 WL 5203600 (D. Del. Sept. 1, 2020)....................... 8

*Mondis Tech. Ltd v. LG Elecs., Inc.*,
  407 F. Supp. 3d 482 (D.N.J. 2019) ................................................................ 15

*Nachtman v. Jones & Laughlin Steel Corp.*,
    134 F. Supp. 392 (W.D. Pa. 1955) ...................................................................... 8

*Niazi Lic. Corp. v. St. Jude Medical S.C., Inc.*,
    30 F.4th 1339 (Fed. Cir. 2022) ........................................................................... 7

*Omega Patents, LLC v. CalAmp Corp.*,
    13 F.4th 1361 (Fed. Cir. 2021) ......................................................................... 11

*Packet Intel. LLC v. NetScout Sys., Inc.*,
    965 F.3d 1299 (Fed. Cir. 2020) .................................................................. 10, 15

*Paymaster Techs., Inc. v. U.S.*,
    180 F. App'x 942 (Fed. Cir. 2006) .................................................................... 10

*Smartflash LLC v. Apple Inc.*,
    No. 6:13-CV-447-JRG, 2015 WL 5840237 (E.D. Tex. Sept. 2, 2015) .......................... 15

*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278 (Fed. Cir. 2020) .................................................................... 7, 10

*Virnetx, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ........................................................................ 12

*Wordtech Sys., Inc v. Integrated Networks Sol'ns, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010) .................................................................. 11, 13

**Rules**

Fed. R. Civ. P. 50(b) ............................................................................................ 1

Fed. R. Civ. P. 59 ................................................................................................ 1

## I.    <u>INTRODUCTION</u>

The Court should grant judgment as a matter of law of no damages pursuant to Fed. R. Civ. P. 50(b). At a minimum, a new trial on damages is needed pursuant to Fed. R. Civ. P. 59.

*First*, Ollnova failed to tie damages to the scope of any infringement. Ollnova's infringement theories were based on specific configurations of the accused products, which varied across different claims of different asserted patents. At trial, Ollnova's expert disregarded these distinctions, and uniformly pulled the same accused products and configurations into the royalty base for each patent—regardless of what was required to infringe under Ollnova's own theories.

*Second*, Ollnova's primary, "income approach" damages calculation centered on the cost of designing around the '282 patent and assumed the '282 patent was valid and infringed. Ollnova offered no income approach calculation, for any patent, to address a situation where the '282 patent was invalid—as the jury ultimately found. Thus, Ollnova presented an inapplicable, improperly inflated, and prejudicial damages calculation that cannot be reconciled with the verdict.

*Third*, Ollnova's secondary, "market approach" calculation was improperly based on licenses for ██████████████ — ████████████—and assumed they all were of equal value. This is irreconcilable with the verdict that the '282 patent was invalid, and it fails the Federal Circuit's requirements that damages be tied to the value of infringed patents.

*Fourth*, for all patents, Ollnova included pre-suit sales in the royalty base. However, there were multiple scenarios where pre-suit sales could not be included in the royalty. For example, Ollnova admittedly could not obtain pre-suit royalties for indirect infringement, which was the only type of infringement alleged for the '495 patent. But, Ollnova did not vary the royalty base; it instead applied the same base to situations where pre-suit damages were, and were not, available.

## II.    <u>STATEMENT OF FACTS</u>

### A.     Ollnova's Theories of Infringement Were Based on Precise and Specific Product Configurations

Ollnova's damages expert (Mr. Bergman) offered multiple royalty calculations, purportedly based on the infringement theories that Ollnova was trying to prove. In presenting those theories, Ollnova's infringement expert (Dr. Madisetti) confirmed that it is "important to be precise when you identify the infringing configuration for each patent and for each claim." Ex. 1 [Trial Tr.] at 443:6-8. For example, Dr. Madisetti opined that, with respect to the '495 patent, the "infringing configuration" would be "an ecobee thermostat and a smart sensor together"—but only "[i]f there's a WiFi network" and the thermostat is not the Smart Si model. *Id.* at 273:7-18, 396:14-17. For claim 17 of the '371 patent, Dr. Madisetti testified that "the infringing configuration is thermostats, not including Smart Si, and at least two remote sensors." *Id.* at 345:24-346:10, 397:5-12. Ollnova accused ecobee of infringing that claim only indirectly. By contrast, Ollnova accused ecobee of directly infringing other claims of the '371 patent, based on a different arrangement. Dr. Madisetti opined that "the thermostats, not including the Smart Si" alone, "without any remote sensors," practice apparatus claims 1 and 5 of the '371 patent. *Id.* at 333:21-334:4, 397:13-17. In sum, Ollnova advanced at least five different theories for how different configurations of accused products infringed various claims of the asserted patents. Ex. 2 [Madisetti Dems.].

Ollnova also admitted that each accused product can be used in non-infringing configurations. Dr. Madisetti conceded, for example, that ecobee's thermostats work without WiFi or any "internet connection." Ex. 1 [Trial Tr.] at 400:1-18, 401:10-14. He also acknowledged that those thermostats can be used "without any remote sensors." *Id.* at 400:15-18, 401:10-24.

### B.     Ollnova's Overbroad Damages Theories Are Not Tailored to its Precise and Specific Infringement Theories

Mr. Bergman's royalty calculations for past damages were $46.6 million based on an "income approach," and $47.6 million based on a "market approach." However, both figures

included pre-complaint sales—even though (as described below) several of Ollnova's infringement theories did not apply to products sold prior to the complaint. Mr. Bergman testified that damages would total $11.8 million for all four asserted patents (including the '282 patent) if limited to post-complaint sales. Ex. 1 [Trial Tr.] at 460:24-461:3; *see also id.* at 465:7-9 (assumes that all four asserted patents were valid and infringed).

### 1.    Ollnova's Income Approach

Ollnova's income approach was based on a "per-unit" royalty representing the purported cost of implementing a non-infringing alternative for each patent. At the center of the income approach was the '282 patent (which, as discussed below, the jury ultimately determined to be invalid). Specifically, Mr. Bergman testified that ecobee could design around the '282 patent by redesigning its remote sensors so that temperature-sensing and occupancy-sensing functionalities that are currently combined in a single housing would be separated into two different housings. *Id.* at 481:12-482:1. Mr. Bergman estimated that this redesign would cause ecobee to incur an additional ▮▮▮▮▮ in costs for stand-alone occupancy sensors. *See id.* at 489:21-490:9. He multiplied that per-unit royalty by a base of ▮▮▮▮▮ sensors—which accounts for pre-and post-complaint sales.[1] *Id.* Mr. Bergman adjusted his calculation to account for ▮▮▮ per-unit savings that ecobee would allegedly receive by making ▮▮▮▮▮ stand-alone temperature sensors. *Id.* He thereby arrived at a $27,234,801 royalty for the '282 patent.[2] *Id.*

Mr. Bergman next performed similar calculations for the '371 and '495 patents; but, as discussed below, his damages calculations for these patents were premised on his design-around

---

[1] ▮▮▮▮▮ represents ▮▮% of the ▮▮▮▮▮ remote sensors that ecobee sold during the alleged damages period. Mr. Bergman did not reduce the occupancy sensors by ▮▮% to account for non-infringing configurations, but rather to try to account for a hypothetical demand for stand-alone occupancy sensors. Ex. 1 [Trial Tr.] at 489:8-15.
[2] Expressed as: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ = $27,234,801 [sic, $27,239,549.6]. Mr. Bergman presented the erroneous calculation to the jury. Ex. 3 [Bergman Dems.] at PDX3.51.

theories for the '282 patent—which, in turn, **_assumed the '282 patent was valid and infringed_**. For the '371 and '495 patents, Mr. Bergman opined that the design-around for these patents would entail redesigning the remote sensors to replace a low frequency communication chip with a WiFi communication chip, at an additional cost of ▮ per sensor. Ex. 1 [Trial Tr.] at 493:5-17. However, he applied that ▮/unit royalty rate to a base which assumed the existence of **_separate temperature and occupancy sensors_**—i.e., the base he concocted as a design-around for the **_assumed infringed '282 patent_**. Mr. Bergman was explicit that ecobee "infringing the '282 patent" was an "important" predicate to his royalty base for the '495 and '371 patents. *Id*. at 493:23-494:5. As a result, the base that Mr. Bergman used for the '495 and '371 royalty calculations was artificially inflated based on an assumption that the larger base would be necessary in a world where the '282 patent was also valid and infringed. Specifically, Mr. Bergman applied the ▮ per-unit royalty to ▮ stand-alone temperature sensors *and* ▮ standalone occupancy sensors—even though ecobee had sold no more than ▮ remote sensors during the entire pre- and post-complaint damages period. Ex. 3 [Bergman Dems.] at PDX3.61.[3] Moreover, with respect to the '495 patent, this royalty base was further inflated by the fact that Mr. Bergman relied on pre-complaint sales figures, even though the damages period for the '495 patent began, according to Mr. Bergman, with the filing of the complaint in March 2022. Ex. 1 [Trial Tr.] at 551:19-22. Mr. Bergman thereby arrived at a $19,347,252 royalty for the '371 and '495 patents.[4] So, in total, Ollnova's royalty for the '282, '495 and '371 patents under the income

---

[3] Further highlighting Mr. Bergman's improper conflation of liability for the various patents, Mr. Bergman attributed his alleged additional ▮ per concocted standalone occupancy sensor to the '282 patent in his expert report (Ex. 4 [Bergman Report] at 76 n.368), and not to the '371 and '495 patents, as he presented at trial.

[4] Expressed as: ▮ = $19,347,252. Ex. 3 [Bergman] at PDX3.61.

approach was $46,582,054 (i.e., $27,234,801 + $19,347,252).[5] This figure—which depends in multiple ways on the false assumption that the '282 was valid and infringed—is the income approach number that Mr. Bergman presented to the jury. Thus, Mr. Bergman's income approach did not tie his royalty calculation to the alleged infringement described by Dr. Madisetti.[6]

### 2.  Ollnova's Market Approach

Mr. Bergman calculated an alternative $47.6 million royalty under a "market approach." At the center of the market approach was third-party ███████ payment of ███████ for a license to ███████████████████████████████████████████. Mr. Bergman did nothing to differentiate between the value of any particular patent asset among the ███████ ███████. Rather, he assumed "all ███ patents [have] equal value" in attempting to apportion the value of the ███████ license to the value of the patents-in-suit. Ex. 1 [Trial Tr.] at 508:23-24. Thus, not only was ████████████████████████████████████████████████████████ ████████████████████████████████████████. Mr. Bergman also multiplied the value of the ███████ license by roughly ███████ to account for alleged differences in ███████ and ecobee's share of the smart thermostat market on Amazon from 2019-2022. *Id.* at 503:23-505:13.

### 3.  Ollnova's Improper Inclusion of Pre-Suit Sales in the Royalty Base

Mr. Bergman's royalty base indiscriminately included all sales of all products that purportedly infringed all patents, including pre-complaint sales. However, there were multiple infringement scenarios under which Ollnova was not entitled to royalties on pre-complaint sales—

---

[5] Mr. Bergman did not present an income approach calculation for the asserted '887 patent. Ex. 1 [Trial Tr.] at 495:15-18.

[6] Mr. Bergman further calculated a running royalty rate of ███████ (although the jury ultimately did not award a running royalty). This rate was derived by dividing the flawed $46,582,054 figure above (which, again, is premised on the '282 patent being found valid and infringed) by ███████, which purportedly reflects the total number of accused products (including pre-complaint sales). Ex. 1 [Trial Tr.] at 496:3-8.

including scenarios where **Ollnova *conceded* it could not recover pre-complaint damages**. For example, Ollnova "admit[ted] that it does not seek any pre-suit damages" for claim 17 of the '371 patent and all asserted claims of the '495 patent, as Ollnova only alleged indirect infringement of those claims, and ecobee had no notice of the claims prior to this lawsuit. Dkt. 199 at 23.

Moreover, pre-complaint sales were unavailable due to a lack of patent marking. Siemens' APOGEE system is described as an embodiment of the inventions claimed in the '887, '282, and '371 patents and still available today, and therefore was identified by ecobee as a product that required marking. Ex. 1 [Trial Tr.] at 418:11-22, 425:4-20, 426:6-19, 556:12-14. In response, Ollnova never presented evidence that APOGEE was marked with the asserted patents. Instead, Dr. Madisetti testified that he was not "aware" of whether an APOGEE system practiced the claims of those patents. *Id.* at 363:5-25. Dr. Madisetti offered no opinion testimony that APOGEE did not practice the patents. Ollnova also insinuated improperly that ecobee had the burden to prove infringement of the APOGEE system. *Id.* at 444:9-18.

## C. The Jury's Verdict; Invalidation of '282 Patent

The jury awarded damages in an amount that neither party proposed: an $11.5 million lump sum for the life of the patents, based on infringement of at least one unspecified claim of the '495, '887 and/or '371 patents. It found all asserted claims of the '282 patent invalid. The verdict form required the jury (over ecobee's objection) to: (i) find infringement without specifying the infringed patent(s); and (ii) award a lump sum without setting a start date for damages.[7] Dkt. 225.

---

[7] As explained in ecobee's motion for a new trial based on the verdict form, the verdict form improperly grouped infringement of four patents into a single question that did not require unanimous agreement as to the infringed patent. Thus, at the very least, a new trial on damages would be needed if the Court accepts any one of ecobee's arguments herein, since the basis for the jury's damages award is unascertainable. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 312 (1986) (finding an error "difficult, if not impossible, to correct without retrial" because "the verdict does not reveal the means by which the jury calculated damages").

## III.    <u>ARGUMENT</u>

Judgment as a matter of law of no damages is warranted because neither of Ollnova's approaches (income and market) provided adequate evidence for the jury to award damages. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291-92 (Fed. Cir. 2020) (awarding no damages despite infringement finding); *see also Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1335 (Fed. Cir. 2009) (vacating damages where "the jury's damages award is not supported by substantial evidence, but is based mainly on speculation or guesswork"). In the alternative, the Court should grant a new trial on damages, which were excessive in view of the evidence.

### A.    **Income Approach: Ollnova Failed to Tie its Royalty Base to Infringing Acts**

Mr. Bergman's income approach did not connect damages to any infringing configuration. "The statute does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts." *TecSec*, 978 F.3d at 1291-92 (affirming "reduction of the jury's damages award to zero" where patentee based its royalty on "[s]ales of Acrobat" but infringement "occurs only after Acrobat is installed"). For example, in *Lucent Techs.*, the Court explained that Plaintiff "had the burden to prove that the extent to which the infringing method has been used supports the lump-sum damages award." *Lucent Techs.*, 580 F.3d at 1334-35. Because "[n]o evidence describe[d] how many [accused product] users had ever performed the patented method or how many times," the Court vacated the lump sum award. *Id*.[8]

### 1.    **Mr. Bergman Improperly Tied His Royalty Base to *Invalid* Claims.**

Mr. Bergman's royalty base for his income approach was far more improper than the

---

[8] Similarly, in *Niazi Lic. Corp. v. St. Jude Medical S.C., Inc*., 30 F.4th 1339, 1356-58 (Fed. Cir. 2022), the Court found that patentee's expert improperly "included in his damages calculations sales of all of [defendant's] outer catheters, inner catheters, guide wires, and leads, even though it was undisputed that not all of those sold devices had been used to practice the [claim]."

royalty bases that were rejected in *TecSec*, *Lucent*, and *Niazi*.[9] He included ***all*** of ecobee's remote sensor sales, without regard to whether they had been used in a configuration that infringed any particular patent claim. He compounded the problem by increasing those sales by ██% based on the assumption that the '282 patent was valid and infringed. Specifically, Mr. Bergman intertwined his income approach calculation for the '495 and '371 patents with the infringement of the '282 patent by using a royalty base of ███████ sensors, a total that would apply only in a scenario where ecobee needed to design around the '282 patent by splitting its sensor functionality into two different sensors. Ex. 1 [Trial Tr.] at 493:25-494:7; Ex. 3 [Bergman Dems.] at PDX3.61. But that premise was proven false when the jury invalidated the '282 patent. Dkt. 225 at 6. Mr. Bergman thus calculated damages based not on the number of potentially "infringing" sensors actually sold (i.e., ████████), but instead based on an imaginary number that included an additional ████████ sensors that he brought into his calculation based on his false assumptions about the '282 patent.

Mr. Bergman never even attempted to determine damages for infringement of the '495 and/or '371 patents if, as the jury found, the '282 patent claims were invalid. For that reason alone, Ollnova failed to provide sufficient evidence of damages under the income approach. *See Nachtman v. Jones & Laughlin Steel Corp*., 134 F. Supp. 392, 407 (W.D. Pa. 1955) (finding "Plaintiff chose to stand or fall on the proposition that all of his patents are valid and that all are infringed," and its expert's "failure to segregate his damages rendered plaintiff's position untenable in the event that but one or less than all of plaintiff's patents were found valid and

---

[9] Mr. Bergman's use of the income approach does not excuse his failure to select an appropriate base. For example, in *Microchip Tech. Inc. v. Aptiv Servs. US LLC*, No. 1:17-CV-01194, 2020 WL 5203600 (D. Del. Sept. 1, 2020), the Court rejected patentee's damages analysis that applied a per-unit royalty derived from cost savings to the incorrect royalty base. *Id*. at *5 ("While Dr. Becker might have used a cost savings approach to apportion the value of the various components, he was not permitted to use the Dual Role Hub as the base for his cost-savings analysis.").

infringed"), *aff'd*, 235 F.2d 211 (3d Cir. 1956). Mr. Bergman compounded the problem by using the ▮▮▮▮▮ figure for both the '495 and '371 patents—even though damages for the '495 patent did not even arguably accrue until the filing of the complaint. Dkt. 199 at 23. His calculation thus had no relationship to any possible finding of infringement of the '495 or '371 (or '887)[10] patents.

### 2. Mr. Bergman Did *Not* Tie His Royalty Base to Infringing Configurations.

Even if Mr. Bergman had limited his royalty base to the number of remote sensors ecobee actually sold, it would still be improper. The sensors themselves do not allegedly infringe. Rather, the asserted claims require "precise" configurations of, e.g., a thermostat, a certain number of sensors, and a wireless internet network. For example, according to Ollnova, claim 17 of the '371 patent requires two sensors paired with a thermostat, whereas claims 1 and 5 do not require any sensors. And the '495 patent requires a thermostat, sensor, and wireless internet network. Sec. II.A.

It was undisputed that ecobee's sensors could be used in a manner that did not meet these configurations. For example, as Ollnova concedes, ecobee's thermostats work without any internet connection or remote sensors. *Id*. If sensors were used without a wireless internet network, the configuration would not even allegedly infringe the '495 patent. If only one sensor was used, the configuration would not even allegedly infringe claim 17 of the '371 patent. And sensor sales do not even allegedly "correlate[]" with infringement of the other asserted claims of the '371 patent since, as Ollnova contends, those claims do not require sensors. *Lucent*, 580 F.3d at 1334.

Yet, Mr. Bergman calculated damages based on every sensor sold (plus his fabricated sensors based on the unnecessary '282 design around) without attempting to connect his calculations to whether such sensor may have been arranged in an infringing manner. *See Packet*

---

[10] As noted above, Mr. Bergman did not quantify an income approach calculation for the '887 patent. Ex. 1 [Trial Tr.] at 495:15-23.

*Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1315 (Fed. Cir. 2020) (reversing this Court's denial of JMOL on damages where Ollnova's expert in this case, Mr. Bergman, failed to "tailor[]" his "damages base" to the alleged infringement); *Enplas Display Device Corp. v. Seoul Semi Co., Ltd.*, 909 F.3d 398, 410-11 (Fed. Cir. 2018) (vacating damages award where patentee's expert testified that the parties would have agreed to a lump-sum royalty based on the "volume of sales of *potentially* infringing products" because "[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement") (emphasis original) (citation omitted); *Paymaster Techs., Inc. v. U.S.*, 180 F. App'x 942, 944, 948 (Fed. Cir. 2006) (vacating damages award because 10% of the accused products may not have infringed). Mr. Bergman's income approach thereby contravened Federal Circuit precedent requiring that experts tie damages to infringing acts. *TecSec*, 978 F.3d at 1291-92. Thus, Ollnova failed to provide sufficient evidence of damages, and none should have been awarded. *Id.*[11]

**B.    Market Approach: Ollnova's Reliance on a Non-Comparable Agreement Failed to Apportion Value between Patents-in-Suit and Unasserted Patents**

Mr. Bergman's alternative damages calculation, based on the royalty in the ▆▆▆▆ agreement, could not support the damages award because it failed to apportion the value of that agreement to reflect the value of the asserted patents. *See Lucent*, 580 F.3d at 1328-31 (vacating damages where expert's reliance on allegedly comparable agreements failed to apportion to reflect the value of the asserted patents); *Apple Inc. v. Wi-Lan Inc.*, 25 F.4th 960, 973-74 (Fed. Cir. 2022)

---

[11] Mr. Bergman further violated Federal Circuit precedent by adopting 100% of ecobee's alleged cost savings as the royalty. "Because [ecobee] would be no better off by bargaining away all its avoided costs, 100 percent of those costs cannot possibly be 'the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.'" *Looksmart Grp., Inc. v. Microsoft Corp.*, No. 17-cv-04709, 2019 WL 4009263, at *3-4 (N.D. Cal. Aug. 5, 2019) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)). The "assumption that the [hypothetical] negotiation would start with all of the avoided costs going to" the patentee cannot "be squared with *Virnetx.*" *Id.* (quoting *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332-34 (Fed. Cir. 2014)).

(same); *see also Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1378-81 (Fed. Cir. 2021) (expert failed to distinguish the value of the asserted patents from the value of other patents in allegedly comparable agreements); *In re Koninklijke Philips Patent Litig.*, No. 18-cv-01885-HSG, 2020 WL 7398647, at *9 (N.D. Cal. Apr. 13, 2020) (expert's reliance on portfolio rates "did not 'apportion' the value of the asserted patents compared to the unasserted patents in each" portfolio).

The ▇▇▇ agreement conveyed a license to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇. But, the hypothetical license includes only four asserted patents. Mr. Bergman did not analyze the ▇▇▇▇▇▇▇▇▇▇▇▇▇ or attempt to reconcile the technical scope of that license with the scope of the hypothetical license. He simply assumed all ▇▇ assets had equal value, presumably multiplying the value of ▇▇▇▇▇▇▇▇▇▇▇▇.[12] But "the case law is clear that mere patent counting and dividing is not enough." *Golden Bridge Tech. v. Apple Inc.,* No. 5:12-CV-04882-PSG, 2014 WL 2194501, at *6 (N.D. Cal. May 18, 2014); *see also, e.g.*, *Personalized Media Commc'ns, LLC v. Apple, Inc.*, No. 2:15-CV-01366-JRG-RSP, 2021 WL 662237, at *6-7 (E.D. Tex. Feb. 20, 2021) (improper to calculate the "percentage of value added by the patents-in-suit by '[a]ssuming equal value of the [portfolio] patents and . . . divid[ing] the three patents-in-suit by'" the total number of patents) (citation omitted); *Avago Techs. Gen. IP (Singapore) Pte Ltd. v. Asustek Comp., Inc*., No. 15-cv-04525-EMC, D.I. 395, at *43-45 (N.D. Cal. Nov. 9, 2016) (finding it "arbitrary" to "simply divide" the royalty rate by a (redacted) number of patents, and excluding opinion for also failing to apportion for other patents).

Mr. Bergman's division method "ma[k]e[s] too crude a generalization" and lacks factual

---

[12] While this calculation is set forth in Mr. Bergman's expert report, he did not explain it (or any of his adjustments to the value of the ▇▇▇ agreement) to the jury. Thus, Mr. Bergman's testimony could not support the verdict, which was "based only on speculation [and] guesswork." *Wordtech Sys., Inc v. Integrated Networks Sol'ns, Inc*., 609 F.3d 1308, 1320, 1322 (Fed. Cir. 2010).

ties to the case. *Cf. Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332 (Fed. Cir. 2014). To properly rely on a portfolio license, an expert must explain the "functionality enabled by the patent-in-suit as well as the functionality purportedly covered by the [other] licensed patent[s] and compare their economic importance." *LaserDynamics, Inc. v. Quanta Comp., Inc.*, No. 2:06-CV-348, 2011 WL 7563818, at *3 (E.D. Tex. Jan. 7, 2011). Mr. Bergman did not even try to analyze the technical differences between █████████████████████████████████, or assess the economic effect of those differences. Mr. Bergman's assumption that all ███ patent assets had equal value is especially inappropriate and disconnected from the facts of this case in view of his own income approach, which ascribed different values to different patents (e.g., the '371 and '282 patents). *See Limelight Networks, Inc. v. XO Comm's, LLC*, No. 3:15-cv-720-JAG, 2018 WL 678245, at *7 (E.D.V.A. Feb. 2, 2018) ("Meyer's even-division method fails because it simply ignores facts in the case that . . . different patents have different values.").

Mr. Bergman further erred by multiplying the value of the ██████ agreement by █████. He derived that value from ecobee's and ██████ alleged relative shares of the smart thermostat market on Amazon from 2019-2022, a decade after the hypothetical negotiation. Ex. 1 [Trial Tr.] at 503:23-505:5. Even if those shares could inform the 2012 hypothetical negotiation, they still would be arbitrary for being limited to: (1) one product category (thermostats); and (2) one sales channel (Amazon). As Mr. Bergman conceded: (1) the asserted claims are not limited to thermostats, which the patents-in-suit do not even mention, and instead relate to controlling building components generally; and (2) ██████ sales were not limited to Amazon or smart thermostats, as it █████████████████████ ████████[13] through other channels. Ex. 1 [Trial Tr.]

---

[13] The patents-in-suit describe HVAC systems as a building component that may be controlled with the claimed inventions. *See, e.g.*, Ex. 5 ['495 patent] at 1:10-15, 9:34-51.

at 538:2-540:7. Thus, Mr. Bergman's arbitrary market share multiplier did not even attempt to encompass the total units that ██████ sold under its license. *See Wordtech*, 609 F.3d at 1320 (rejecting reliance on "lump-sum licenses [that] provide no basis for comparison with [defendant's] infringing sales" where the licenses did not describe "the licensees' intended products[] or how many products each licensee expected to produce"). Like the patentee in *Wordtech*, Ollnova had no "idea of the volume of sales or projected sales" by ██████ under its license. *Id.* And its self-serving market share analysis, excluding non-Amazon retailers and all products other than thermostats, left the jury with only "speculation or guesswork" to compare the values of the ██████ and hypothetical licenses. *Id.* at 1322. Ollnova's failure to address the technical scope of ████████████████████████ just invited more speculation, as Mr. Bergman did not even try to determine the units ██████ sold under those ██████ patent rights. *See Convolve, Inc. v. Dell, Inc*., No. 2:08-CV-244-CE, 2011 WL 13090123, at *2 (E.D. Tex. July 8, 2011) ("Particularly where a license covers a portfolio of patents . . . [the proponent] must present evidence sufficient to allow the jury to weigh the economic value of the patented feature against the economic value of the features and services covered by the license agreement.").[14]

## C.    Ollnova Improperly Included Pre-Complaint Sales in its Damages Proposals

Ollnova included pre-complaint sales in the damages figures it proposed to the jury. Yet, Ollnova admitted that it does not seek damages on pre-complaint sales for both asserted claims of the '495 patent and an asserted claim of the '371 patent. Section II.B.3. Ollnova's conclusory $11.8 million damages proposal for post-complaint sales did not fix this flaw because it included

---

[14] Here too, Mr. Bergman failed to tie his analysis to infringement. He considered relative shares of the smart thermostat market on Amazon, regardless of whether the thermostats were accused of infringement. Mr. Bergman further calculated a per-unit royalty by dividing the $47.57 million royalty he derived from the ██████ license by the total number of accused products. His market approach thus suffered from the same flaw as his income approach, as it similarly relied on all sales of accused units irrespective of whether they had been used in an infringing configuration.

damages for the invalid '282 patent, and Mr. Bergman provided no way for the jury to apportion that figure to just the valid claims found to be infringed.[15] Ex. 1 [Trial Tr.] at 460:24-461:3.

Moreover, no reasonable jury could find that Ollnova satisfied the marking requirement, which forecloses pre-complaint damages. To begin with, Ollnova never notified ecobee of its alleged infringement of the '887, '282, and '371 patents before this case, so pre-complaint damages are precluded if there was a product that should have been marked. After an accused infringer meets the "low bar" of identifying a product that it believes should have been marked, the patent owner has the burden to demonstrate that: (i) the product has been marked; or (ii) the product does not practice the asserted patents. *See Arctic Cat Inc. v. Bombardier Rec. Prods. Inc.*, 876 F.3d 1350, 1368-69 (Fed. Cir. 2017). ecobee identified the APOGEE system provided by Siemens (original assignee of the asserted patents), which is described as an exemplary embodiment in the '887, '282, and '371 patents. *See* Ex. 6 ['887 patent] at 3:45-58; Ex. 7 ['282 patent] at 4:5-25; Ex. 8 ['371 patent] at 3:47-67. Ollnova has never contended or offered any evidence that APOGEE was in fact marked. Ollnova thus had the burden to prove that APOGEE need not be marked. Dr. Madisetti's conclusory testimony that he was not "aware" of any APOGEE component that practices certain claim limitations cannot carry Ollnova's burden. Ex. 1 [Trial Tr.] at 363:5-364:3.

For example, in *Innovative Memory Sys., Inc. v. Micron Tech., Inc*., C.A. No. 14-1480-RGA, 2022 WL 4548644, at *15 (D. Del. Sept. 29, 2022), patentee's "expert said that 'there is no evidence that any of the SanDisk products . . . engages in [certain limitations required by the '498 patent claims].'" *Id.* at *15 (alterations original). Patentee also alleged that the accused infringer

---

[15] Also, Mr. Bergman incorrectly ignored the different damages start dates for the various asserted claims in the alleged adjustment he performed in his market approach analysis to account for the "shorter period" of the license resulting from the hypothetical negotiation as compared to the length of the ███ agreement. Ex. 1 [Trial Tr.] at 505:14-22, 508:5-17.

"referred to SanDisk user manuals that described the products at only a high level and d[id] not establish that they meet the elements of the claims." *Id.* The Court found that "[n]either of those things are evidence that the SanDisk products are not covered by the '498 patent," and therefore excluded pre-suit damages. *Id.* (explaining that patentee "shift[ed] [its] burden of proof" to the accused infringer). For similar reasons, the Federal Circuit reversed the denial of JMOL that the accused infringer was not liable for pre-suit damages in *Packet Intelligence*. It rejected patentee's "conclusory testimony" that a product "does not practice" the asserted patent because the testimony did not "match[] the limitations in any claim . . . to the ***features*** of the" product. *Packet Intel.*, 965 F.3d at 1313-14 (emphasis added). Likewise, Ollnova neglected to compare features of the APOGEE system with the limitations of the asserted claims. Rather, Dr. Madisetti merely opined that he was not "aware" of APOGEE systems that practiced the asserted claims—just like the conclusory testimony that fell short in *Innovative Memory* and *Packet Intelligence*.[16]

Ollnova's inclusion of pre-complaint sales in its royalty base alone warrants JMOL of no damages, as it provided no way to limit damages to post-complaint sales if, as the jury found, the '282 patent claims were invalid. Mr. Bergman's reliance on pre-complaint sales at a minimum warrants a new trial, as the $46.5 million proposal "skewed" the damages horizon and prejudiced ecobee. *Smartflash LLC v. Apple Inc.*, No. 6:13-CV-447-JRG, 2015 WL 5840237, at *8 (E.D. Tex. Sept. 2, 2015); *Mondis Tech. Ltd v. LG Elecs., Inc.*, 407 F. Supp. 3d 482, 497 (D.N.J. 2019).

## IV.    **CONCLUSION**

The Court should grant JMOL or a new trial on damages.

---

[16] The failure to satisfy the marking requirement is even more apparent here than in *Packet Intelligence*. There, patentee removed reference to the product in a priority application before filing for the asserted patent. *Id.* Here, Ollnova never removed reference to APOGEE, which the asserted patents still describe as an embodiment of the invention. Ollnova cannot carry its burden by feigning ignorance as to the system that its own patents concede practices the claimed inventions.

Dated: March 29, 2024                            Respectfully submitted,

By: */s/ Jennifer Parker Ainsworth*
Jennifer Parker Ainsworth
TX Bar No. 00784720
WILSON, ROBERTSON &
CORNELIUS, P.C.
909 ESE Loop 323, Suite 400
Tyler, Texas 75701
(903) 509-5000
Email: jainsworth@wilsonlawfirm.com

Michael P. Sandonato
Manny J. Caixeiro
VENABLE, LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
(310) 229-9900
Email: MSandonato@venable.com
MJCaixeiro@venable.com

Megan S. Woodworth
Jason M. Dorsky
Venable LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
(202) 344-4000
Email: MWoodworth@venable.com
JMDorsky@venable.com

*Attorneys for Defendant*
*ecobee Technologies ULC d/b/a ecobee*

16

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this SEALED DOCUMENT was served this 29th day of March, 2024, via Email in accordance with the Local Rules.

By: <u>*/s/ Jennifer Parker Ainsworth*</u>
Jennifer P. Ainsworth

**<u>CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL</u>**

The undersigned certifies that, pursuant to Local Rule CV-5(7)(A), authorization for filing the foregoing pleading and/or exhibits thereto under seal has been conveyed through the Protective Order (Dkt. 42) entered in this matter.

By: <u>*/s/ Jennifer Parker Ainsworth*</u>
Jennifer P. Ainsworth

17