IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

OLLNOVA TECHNOLOGIES, LIMITED, (  CAUSE NO. 2:22-CV-072-JRG
                                 )
          Plaintiff,             (
                                 )
vs.                              (
                                 )
ECOBEE, INC., et al.,            (  MARSHALL, TEXAS
                                 ) OCTOBER 5, 2023
          Defendants.            (  8:00 A.M.
_____

VOLUME 5

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

                        A P P E A R A N C E S

       FOR THE PLAINTIFF:    BC LAW GROUP, P.C.
                             200 MADISON AVENUE, 24TH FLOOR
                             NEW YORK, NEW YORK  10016
                             (516) 359-9668
                             BY: MR. BRETT COOPER
                                 MR. JONATHAN YIM

                             WARD, SMITH & HILL, PLLC
                             1507 BILL OWENS PARKWAY
                             LONGVIEW, TEXAS  75604
                             (903) 757-6400
                             BY:  MS. ANDREA FAIR
                                  MR. GARRETT PARISH

       FOR THE DEFENDANTS:   VENABLE, LLP - LOS ANGELES
                             2049 CENTURY PARK EAST
                             SUITE 2300
                             LOS ANGELES, CA 90067
                             (310) 229-9900
                             BY:  MR. MANNY CAIXEIRO

                             VENABLE, LLP - WASHINGTON DC
                             600 MASSACHUSETTS AVE., NW
                             WASHINGTON, DC 20001
                             (202) 344-4000
                             BY:  MR. JASON DORSKY
                                  MS. MEGAN WOODWORTH

                             VENABLE, LLP - NEW YORK
                             1290 AVENUE OF THE AMERICAS
                             20Th FLOOR
                             NEW YORK, NEW YORK  10104
                             (212) 218-2209
                             BY:  MR. DANIEL APGAR
                                  MR. MICHAEL SANDONATO

                             VENABLE, LLP - CHICAGO
                             227 WEST MONROE ST., STE. 3950
                             CHICAGO, ILLINOIS  60606
                             (312) 820-3400
                             BY:  MR. TIMOTHY CARROLL

                    Shawn M. McRoberts, RMR, CRR
                  Federal Official Court Reporter

```
                                  WILSON, ROBERTSON &
                                  VANDEVENTER, P.C.
                                  909 ESE LOOP 323, SUITE 400
                                  TYLER, TEXAS   75701
                                  (903) 509-5000
                                  BY:  MS. JENNIFER AINSWORTH


            OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                  100 E. HOUSTON STREET
                                  MARSHALL, TEXAS   75670
                                  (903) 923-8546
```

THE COURT:  Be seated, please.

Good morning, counsel.  Before we begin with the formal charge conference, let me inquire, are the parties prepared to read into the record the items from the list of the pre-admitted exhibits used during yesterday's portion of the trial?

MR. PARISH:  We're ready, Your Honor.

I don't know --

MR. DORSKY:  We are also ready, Your Honor.

THE COURT:  All right.  Then let's proceed.

MR. PARISH:  Your Honor, Plaintiff admitted no additional exhibits yesterday.  However, I understand that Defendant admitted additional exhibits, and I will allow them to do the rendition.

THE COURT:  All right.  Mr. Caixeiro, what's Defendants' position?

MR. CAIXEIRO:  Yes, Your Honor.  Defendants used and ask to be admitted JTX 25, 26, 27, and 31.

THE COURT:  All right.  Any objection to that rendition, Mr. Parish?

MR. PARISH:  No, Your Honor.

THE COURT:  All right.  Thank you.

All right.  We'll now proceed to conduct a formal charge conference on the record.  At the close of the evidence yesterday, the Court took up and heard motions from both

parties pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. After the Court ruled on those various motions, the Court then met with counsel in chambers and held an informal charge conference off the record where the Court had an opportunity to hear informally and fully from both sides' counsel as to the then current version of the final jury instructions and verdict form. After a fairly lengthy informal charge conference, the Court took into account the various input, the comments received by it from the parties through their counsel, and over the evening generated and produced what it now believes to be the final and appropriate charge to the jury and verdict form. That was delivered to counsel electronically earlier this morning. They've had an opportunity to review it and consider it. And the Court will now take up the current version of the final jury instructions and verdict form and hear any objections that either party wishes to make in regard to the same.

As I indicated to you yesterday, counsel, my practice is to ask that a single spokesperson for each party go to the podium, remain there together, and I will walk through these documents beginning with the final jury instructions on a page-by-page basis.

As we come to any page where you believe something has been included that should not have been or you find that something has been omitted that you believe should have been

included, you're at liberty to offer such objections as you feel are necessary.  And upon any such objections being made, the Court will consider and rule upon the same and then we'll move forward to the next page.  And as I say, we'll walk through both of these documents on a page-by-page basis to make sure that we don't overlook or omit anything.

So with that, whoever's going to speak for Plaintiff and whoever's going to speak for Defendant, please go to the podium.

We'll begin with the final jury instructions.

We'll begin on the cover page or the first page of those final jury instructions.  Are there objections here from either party, Plaintiff or Defendant?

MR. PARISH:  No objection Your Honor.

MR. DORSKY:  No objection.

THE COURT:  Turning then to page 2 of the final jury instructions, are there any objections here from either party?

MR. PARISH:  No objection for Plaintiff.

MR. DORSKY:  No objection for Defendant.

THE COURT:  Turning, then, to page 3, are there any objections here, counsel?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning then to page 4 of the final jury instructions, are there objections here from either side?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No objections for Defendant.

THE COURT:  Next is page 5.  Are there objections here, counsel?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning next to page 6, are there any objections here?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning, then, to page 7 of the final jury instructions, are there any objections from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  Your Honor, ecobee has an objection for page 7.

THE COURT:  State your objection, counsel.

MR. DORSKY:  ecobee objects with the first paragraph of page 7 as inconsistent with the theories and evidence presented by Ollnova.  Ollnova has not contended that ecobee directly infringes any claim of the '495 patent or any method claim of the '371 or the '282 patents.  Ollnova also does not contend every accused product practices every asserted claims.  And the instruction also does not address Ollnova's identification of the infringing configurations raised during the course of trial.  Therefore, ecobee objects as incomplete.

THE COURT:  All right.  That objection is overruled.

Are there any other objections from either party with regard to page 7?

MR. PARISH:  No for Plaintiff, Your Honor.

MR. DORSKY:  No for Defendant, Your Honor.

THE COURT:  All right.  We'll turn then to page 8 of the final jury instructions.

Are there objections here from either party?

MR. PARISH:  No for the Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning, then, to page 9 of the final jury instructions, are there any objections here?

MR. PARISH:  No for the Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Next is page 10.

Are there any objections?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  All right.  Turning, then, to page 11, are there any objections here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  Your Honor, ecobee has an objection on page 11.

THE COURT:  Please state your objection.

MR. DORSKY:  ecobee's objection relates to the

second full paragraph on page 11 and it is the same objection previously raised as to ecobee's objection on page 7 regarding identification of the accused products, asserted claims, and infringing configurations by Ollnova during the course of the trial.

THE COURT:  All right.  That objection's overruled.  Anything further on page 11?

MR. PARISH:  No for the Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning, then, to page 12.  Are there any objections?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning, then, to page 13.  Are there any objections?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning, then to page 14, are there any objections.

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  Your Honor, this is not specifically an objection, but ecobee believes there may be a typo in bullet point 3 on page 14.  There's a reference to granules and it's unclear what that reference is.

THE COURT:  I see that.  That's probably an

extraneous word that was mistakenly included.

It appears to me the right step would be to remove the word completely so that bullet point 3 simply reads "The accused products constitute a material part of the inventions claimed in the asserted patents."

Does either party have any objection to that?

MR. PARISH:  No for the Plaintiff.

MR. DORSKY:  No for the Defendant.

THE COURT:  All right.  Anything further on page 14 before we move forward?

MR. PARISH:  No, Your Honor.

MR. DORSKY:  No for Defendant.

THE COURT:  All right.  Then we'll turn to page 15 of the final jury instructions.  Any objections here?

MR. PARISH:  No for the Plaintiff.

MR. DORSKY:  ecobee has an objection on page 15, your Honor.

THE COURT:  Please state your objection.

MR. DORSKY:  With respect to the instruction on patent eligibility, ecobee objects to the instruction as incomplete and raising a likelihood of confusion. Specifically, step 2 of the eligibility analysis requires consideration of what remains in the claims beyond the abstract idea itself.  Thus, the jury must be informed of the Court's identification of the abstract idea to make this

determination.  The instruction in ecobee's view does not identify that abstract idea.

And moreover, ecobee does not believe the instruction as presented provides a sufficient legal structuring guidance to address the eligibility issue.

On this issue, ecobee tenders the following instruction on patent eligibility:  "ecobee contends that the asserted claims of the '495 patent are invalid for failure to claim patent eligible subject matter.  In general, a patent may be obtained on any new and useful machine, manufacture, or composition of matter or any new and useful improvement thereof.  However, there are certain types of subject matter that are not eligible for patenting, such as abstract ideas.  There is a two-step process for -- for determining whether patent claims cover ineligible subject matter.

"Step 1 requires determining whether the claims are directed to an ineligible category of subject matter such as an abstract idea.  I have already determined that the asserted claims of the '495 patent are directed to an abstract idea.  In particular, I found that the asserted claims are directed to the abstract idea of 'controlling generic components using information from two separate sources (i.e., information from two separate networks).'

"At Step 2 ecobee must demonstrate by clear and convincing evidence that the elements of the asserted claims

when considered individually and as an ordered combination involve only technology which a person of ordinary skill in the art would have considered to be well understood, routine, and conventional as of April 9th 2004.  That is a determination" -- pardon -- "That determination is for you to make based on the following principles.

"In determining whether a patent claim involves well-understood, routine, and conventional technology to a person of ordinary skill in the art, you may consider statements made in the patent specification as well as evidence of the prior art and evidence provided by witnesses.

"An inventive concept may be found in an element or combination of elements that is recited in the claim if that element or combination of elements has not been shown to be conventional.  Use of conventional components in a conventional arrangement cannot supply an inventive concept. The abstract idea cannot supply an inventive concept. Therefore, when considering whether the '495 patent discloses an inventive concept, you must consider what, if anything, is in the claim beyond the abstract idea itself.

"An inventive concept may be found in improvements to existing technology, but only if the improvement is present in the claims.  An improvement described in the patent specification but not reflected in the claims cannot supply an inventive concept.  Patent eligibility is different from

anticipation or obviousness.  A patent may be invalid for claiming subject matter that is not patent eligible even if the idea claimed is new and non-obvious."

That's the end of ecobee's tendered instruction, Your Honor.

THE COURT:  All right.  The Defendants' objection is overruled.

The Court is persuaded that the instruction contained in the final jury instructions before you, when taken with the appropriate question set forth in the verdict form, clearly advises the jury as to their obligation to factually determine the step 2 result, and while the instruction proffered by the Defendant is certainly longer and more detailed, the Court does not find that the instruction its included is substantially deficient nor does the Court find it would likely confuse the jury, and therefore, the objection tendered by Defendant in this regard is overruled.

Anything further on page 15, counsel?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Then we'll turn to page 16 of the final jury instructions.  Are there any objections here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning then to page 17.

Are there objections here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning then to page 18.

Are there objections here?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning then to page 19.

Are there objections here?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Next is page 20.

Are there objections here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning then to page 21.

Are there objections here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning then to page 22.

Are there objections here?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning, then, to page 23.

Are there objections here?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning next to page 24.

Are there objections from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  ecobee has an objection on page 24, Your Honor.

THE COURT:  All right.  State your objection.

MR. DORSKY:  ecobee objects to the last instruction, the last full paragraph on page 24 concerning non-infringing alternatives.

ecobee objects to this instruction as presented as incomplete and potentially confusing to the jurors, including to the extent that it does not provide guidance concerning Ollnova's burden to prove that any such non-infringing alternatives presented during trial were available, acceptable, and non-infringing alternatives.

THE COURT:  That objection's overruled.

Counsel, while we're on page 24, you'll note that page 23 and 24 include all 15 of the *Georgia-Pacific* factors.

I gather neither party objects to the Court charging this jury in this case on all 15 factors.  Is that correct?

MR. PARISH:  No for Plaintiff, Your Honor.

THE COURT:  Do you object to the Court charging the

jury on all 15 *Georgia-Pacific* factors?

MR. PARISH: No objection to the Court charging the jury on all 15 factors, Your Honor.

THE COURT: How about Defendant?

MR. DORSKY: No objection, Your Honor.

THE COURT: All right. Then we'll turn to page 25 of the final jury instructions and I'll ask if there are objections here from either party?

MR. PARISH: No for Plaintiff, Your Honor.

MR. DORSKY: No for Defendant.

THE COURT: Next is page 26.

Are there any objections here?

MR. PARISH: Plaintiff has an objection, Your Honor.

THE COURT: State your objection.

MR. PARISH: Plaintiff objects to the inclusion of the APOGEE system name in the jury instructions because it does not constitute patented article capable of being marked under 31 United States Code § 287.

THE COURT: All right. That objection's overruled.

Is there anything further on page 26? From either party?

MR. PARISH: Nothing for the Plaintiff, Your Honor.

MR. DORSKY: No for Defendant, Your Honor.

THE COURT: All right. Next is page 27.

Any objection here?

MR. PARISH: No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning then to page 28.

Are there objections here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  And finally, turning to page 29, the last page of the final jury instructions, are there objections here from either Plaintiff or Defendant?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  All right.  I'll next move to and take up the verdict form, which has been generated in the same manner and produced to the parties at the same time.  We'll follow the same approach, counsel, in reviewing the verdict form.  We'll begin with page 1 which is the front page of the verdict form.

Are there objections here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning to page 2 where definitions are set forth.

Are there objections here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning to page 3, where instructions to

the jury are located.

Is there any objection here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning to page 4 where question 1 is located.  Are there objections here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  Your Honor, ecobee has an objection to Question No. 1.

THE COURT:  State your objection.

MR. DORSKY:  ecobee objects to Question No. 1 as presented as confusing to the jury and incomplete in view of the instructions and evidence regarding patent-by-patent analysis.

Moreover, Ollnova's theories, both for infringement and damages, differ amongst the four patents as previously stated.  A single question as presented is likely to cause significant prejudice for the parties in post-trial proceedings, including Rule 50(b) motions and appeal, if necessary.

ecobee further notes that the parties' proposed questions separately listed the four asserted patents.  Accordingly, ecobee respectfully submits Question 1 should list each patent separately.

THE COURT:  That objection is overruled.

We'll turn next to page 5 of the verdict form where

question 2 is found.

Are there any objections here?

MR. PARISH:  No objection from the Plaintiff.

MR. DORSKY:  ecobee has an objection, Your Honor.

THE COURT:  State your objection, please.

MR. DORSKY:  ecobee objects to Question No. 2 as incomplete and potentially causing juror confusion.

It is ecobee's position that the question should direct the jury to only consider any additional evidence in the '495 patent beyond the abstract idea itself consistent applicable law and ecobee's objection concerning the jury instructions.

ecobee believes there's a potential for juror confusion without any reference to the abstract idea.

THE COURT:  All right.  I'm going to overrule that objection, but I do have a suggested modification for the parties' consideration on page 5 of the verdict form.

Since this was generated, the Court has reviewed this further and believes that a more precise wording of question 2 would be "Did ecobee prove by clear and convincing evidence that the limitations of claim 1 of the '495 patent, when taken individually or when taken as an ordered combination, involve only technology which a person of ordinary skill in the art would have considered to be well understood, routine, and conventional as of April the 9th, 2004."

I'll ask either party if they have any objection to that

modification of question 2?

MR. PARISH:  No objection from the Plaintiff, Your Honor.

MR. DORSKY:  Your Honor, ecobee maintains its objection concerning --

THE COURT:  I'm not asking you to waive your prior objection.

MR. DORSKY:  Thank you, Your Honor.

With respect to the additional modification, ecobee does not object to the additional language.

THE COURT:  All right.  Then I'll include that modification as stated into the record on Question 2.

Let's turn next to page 6 of the verdict form where Question 3 is located regarding the issue of invalidity.

Are there objections here from either party?

MR. PARISH:  No objection from the Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning then to page 7, where Question 4a and 4b are found.

Are there objections here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  No for Defendant.

THE COURT:  Turning then to page 8 of the verdict form where Question 4c is found.

Is there objection here from either party?

MR. PARISH:  No for Plaintiff.

MR. DORSKY:  ecobee has an objection Your Honor.

THE COURT:  State your objection.

MR. DORSKY:  ecobee objects to Question 4c as presented, which requests the jury to identify a damages period only if a running royalty is awarded.

ecobee believes there is a high likelihood of juror confusion concerning the dates presented and how they relate to any running royalty rate and, in particular, how the dates may relate to an implied running royalty rate, as well as the theories and evidence presented by Ollnova in this case.

ecobee believes a question on the issue of marking that identifies the APOGEE system in the instructions would be significantly less likely to result in such confusion.

THE COURT:  That objection is overruled.

Turning then to page 9, which is the final page of the verdict form.

Are there objections here from either party?

MR. PARISH:  No objection from the Plaintiff, Your Honor.

MR. DORSKY:  No for Defendant.

THE COURT:  All right.  That will complete the formal charge conference, counsel.

I've asked the jury to be available to begin at 9:30. That's approximately an hour from now.  In the interim, I will

make the changes indicated through the formal charge conference process, and I will print and produce eight copies of the final jury instructions and one clean copy of the verdict form that I intend to send back to the jury when they retire to deliberate.

As noted earlier, I intend to tell the members of the jury that they will each have their own printed copy of the Court's final instructions in an effort to encourage them to listen carefully as I give these instructions orally and not be concerned that they need to take written notes during these instructions.

Are there any questions from either Plaintiff or Defendant before we recess with the idea that we'll reconvene at 9:30 and proceed from there?

MR. PARISH:  Nothing further from the Plaintiff, Your Honor.

MR. DORSKY:  Nothing further from Defendant, Your Honor.

THE COURT:  All right.  Thank you, counsel.

Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Counsel, before I bring in the jury and proceed to give them my final instructions and then proceed to hear your closing arguments, I want to revisit briefly an item that we

took up during the formal charge conference.

As a part of reviewing the verdict form in this case, I suggested an amendment to Question 2 during the formal charge conference, on page 5.  After I left the bench I realized that what I had suggested on the record was not completely accurate for what I intended.

I adjusted Question 2 to be what I intended to represent in the proposed amendment during the formal charge conference. I invited counsel for both parties to chambers where we reviewed Question 2.  The current version of Question 2 as discussed in chambers, with no disagreement or objection from either party, reads as follows:  "Did ecobee prove by clear and convincing evidence that the limitations of the asserted claims of the '495 patent when taken individually or when taken as an ordered combination involve only technology which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional as of April the 9th 2004?"

"Answer yes or no."

Just for clarity in the record that is now the way Question 2 is set forth in the verdict form.

And again, based on review of this off the record, in chambers, with counsel, let me query the parties.

Plaintiff, do you have any objection to the Court including Question 2 in the verdict form as I've just read it

1218

into the record?

MR. PARISH:  No objection from the Plaintiff, Your Honor.

THE COURT:  Defendant, do you have any objection?

MR. DORSKY:  No objection to the adjustment.

THE COURT:  All right.  With that, we've already covered the exhibits that were used during yesterday's portion of the trial.

Is there anything I need to take up with any party before I bring in the jury and proceed to give them the Court's final instructions?

MR. COOPER:  Nothing from the Plaintiff, Your Honor.

MR. CAIXEIRO:  Nothing from the Defendant, Your Honor.

THE COURT:  All right.  I will remind you, as I typically do at this juncture, and I'm speaking to everyone in the room, including those of you behind the bar, the Court considers its final instructions to the jury and counsel's closing arguments to be the most serious part of a very serious process.  Therefore, I don't want any distractions, I don't want any disruptions.

For goodness sake, if you have an electronic device, make sure it is silenced.  If there's something you need to go get, if there's something you need to say to somebody sitting next to you, do it now.  Once I bring the jury in, I don't want

people getting up and leaving or coming into the room, I don't want people moving around in their seats, I don't want people leaning over and whispering to their neighbors.

I want complete silence and attention so that there will be nothing that will distract the jury in any way from both my final instructions to them and counsel's competing closing arguments.  I hope that's understood.

All right.  Mr. Barnett, please bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Welcome back.  Please have a seat.

Ladies and gentlemen of the jury, you've now heard all the evidence in this case, and I will now instruct you on the law that you must apply.

I want you to understand, ladies and gentlemen, I'm going to send back with you when you retire to the jury room eight printed copies of these final instructions that I'm about to give you orally.  I do that because I want you to listen carefully as I give them to you orally and not feel compelled to take notes or write things down.  Again, you'll have your own individual copy of these in written form to review, if you choose to, while you're deliberating in the jury room.

It's your duty to follow the law as I give it to you.  On the other hand, and as I've said, you, the jury, are the sole judges of the facts in this case.  Do not consider any

statement that I have made over the course of the trial or that I may make over the course of these instructions as an indication that I have any opinion about the facts in this case.

Now, you are about to hear closing arguments from the attorneys for the competing parties.  Statements and arguments of the attorneys are not evidence, and they are not instructions on the law.  They are intended only to assist the jury in understanding the evidence and the parties' contentions.

A verdict form has been prepared for you, and you'll take this verdict form with you to the jury room.  And when you have reached a unanimous agreement as to your verdict, you will have your foreperson fill in the blanks in that form reflecting those unanimous decisions, date it, sign it, and then advise the Court Security Officer that you have reached a verdict.  Answer the questions as directed in the verdict form from the facts as you find them to be.  Do not decide who you think should win this case, ladies and gentlemen, and then answer the questions to reach that result.  Again, your answers and your verdict must be unanimous.

In determining whether any facts have been proven in this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them.  You may also consider all the exhibits received

and admitted into evidence, regardless of who may have introduced them.

You, the jurors, are the sole judges of the credibility of all the witnesses and the weight and effect to give to all the evidence.  Now, in deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You alone are to determine the questions of credibility or truthfulness of the witnesses.  Now, in weighing the testimony of the witnesses, you may consider the witness' manner and demeanor on the witness stand, any feelings or interest they may have in the case, any prejudice or bias they may have about the case, and the consistency or inconsistency of their testimony, considered in the light of the circumstances.  Has the witness been contradicted by other evidence?  Has he or she made statements at other times and other places contrary to what they said on the witness stand?  You, ladies and gentlemen, must give the testimony of each witness the amount of credibility and weight that you think it deserves.

You must also keep in mind that a simple mistake does not mean that a witness is not telling the truth.  You must consider whether any misstatement was an intentional falsehood or a simple lapse in memory and what significance should be attached to that testimony.

As I've told you previously, the attorneys in this case

are advocates representing their competing clients, and they have a duty to raise objections when they believe evidence is offered that should not be admitted under the rules of the Court.  When the Court sustained an objection to a question addressed to a witness, you must disregard that question entirely, and you may draw no inference from its wording or speculate about what the witness would have said if he or she had been permitted to answer the question.  If the objection, however, was overruled, then you must treat the answer to that question just as you would treat any other question and answer as if no objection had been made.  Now, by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court did not indicate any opinion as to the weight or effect of such evidence.

Now, at times during the trial it was necessary for the Court to talk with the attorneys outside of your hearing, either here at the bench or by calling a recess and talking to them while you were outside the courtroom.  This happens, ladies and gentlemen, because often during a trial things arise that do not involve the jury.  You should not speculate or guess about what was said during any such discussions that took place outside of your presence.

Let me remind you, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as the testimony

of an eyewitness.  The other is indirect or sometimes called circumstantial evidence--that is, the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts.  As a general rule, the law makes no distinction between direct or circumstantial evidence, but simply requires that you find the facts based on the evidence presented, both direct and circumstantial.

Now, over the course of the trial you've been shown some documents where portions of those documents have been redacted.  In those situations, you should not speculate about what may have been redacted or why it was redacted.  Those redactions were approved by the Court prior to the time the trial began.

Also, certain testimony has been presented to you through this trial in the form of a deposition.  A deposition is the sworn, recorded answers to questions asked to a witness in advance of the trial.  If a witness cannot be present in person to testify in open court, then the witness' testimony may be presented under oath in the form of a deposition.

As I've explained, before the trial began the attorneys for both sides representing the parties questioned these deposition witnesses under oath.  A court reporter was present and recorded those deposition witnesses' sworn answers.  Deposition testimony is entitled to the same consideration by you as the testimony given by a witness in person from the

1224

witness stand in open court.  As a result, you should judge the credibility and the importance of the deposition testimony to the best of your ability, just as if the witness had testified before you in person in open court.

Now, while you should consider only the evidence in this case, you are permitted, ladies and gentlemen, to draw such reasonable inferences from the testimony and the exhibits as you feel is justified in the light of common experience.  In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and the evidence in this case.  However, you should not base your decision on any evidence not presented by the parties during this case, including your own personal experiences with any of the products that might be at issue in this case.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the evidence, you believe that single witness.

Also, when knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field--we call them an expert witness--is permitted to state his or her opinions to the jury on those technical matters.  However, ladies and gentlemen,

you are not required to accept those opinions.  As with any other witness, it is solely up to you to decide whether or not to rely on expert witness testimony.

Now, certain exhibits have been shown to you over the course of the trial that were illustrations.  We call these demonstrative exhibits or simply demonstratives. Demonstrative exhibits are a party's depiction, picture, or model to describe something involved in the trial.  If your recollection of the evidence differs from the demonstratives, you should rely on your recollection.  Demonstrative exhibits are sometimes called jury aides.  And demonstrative exhibits, ladies and gentlemen, are not evidence, but a witness' testimony concerning a demonstrative is evidence. Demonstrative exhibits will not be available to you to review during your deliberations in the jury room.

Now, in any legal action, facts must be proved by a required amount of evidence known as the burden of proof.  The burden of proof in this case is on the Plaintiff for some issues and on the Defendant for other issues.  And there are two burdens of proof that you will apply in this case--the preponderance of the evidence and clear and convincing evidence.

The Plaintiff in this case, Ollnova Technologies Limited, which you've heard referred to throughout the trial either as Ollnova or as the Plaintiff, has the burden of proving patent

infringement by a preponderance of the evidence.  Ollnova also has the burden of proving damages for any patent infringement by a preponderance of the evidence.  A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

Now, the Defendant in this case, ecobee Technologies ULC doing business as ecobee, which you've heard referred to throughout the trial simply as ecobee or as the Defendant, has the burden of proving ineligibility or invalidity of Ollnova's patent claims by clear and convincing evidence.  Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable.  Now, although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard. If proof establishes in your mind an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, as I've previously told you, ladies and gentlemen, these two burden of proof are not to be confused with a different burden of proof known as beyond a reasonable doubt, which is the burden of proof applied in a criminal case and

not in a civil case such as this. Beyond a reasonable doubt is a higher standard than both the preponderance of the evidence and clear and convincing evidence.

Now, as I did at the beginning of the case, I'll first give you a summary of each side's contentions in this case and then I'll provide you with detailed instructions about what each side must prove to win on each of its contentions.

As I have previously advised you, this is an action for patent infringement. Ollnova contends that ecobee infringes certain claims of the patents-in-suit. Remember, there are four United States patents-in-suit. They are U.S. Patent number 7,746,887, which you've heard referred to consistently as the '887 patent; United States patent number 7,860,495 which you've heard referred to throughout the trial as the '495 patent; United States patent number 8,224,282, which you've heard referred to as the '282 patent; and United States patent number 8,264,371, which you've heard referred to during the trial as the '371 patent. These are the patents-in-suit. These are also known as the asserted patents.

Now, the Plaintiff, Ollnova, contends that the Defendant, ecobee, infringes the following claims of the patents-in-suit: Claims 1, 11, 12, and 20 of the '887 patent; claims 1 and 2 of the '495 patent; claims 1, 3, 6, and 21 of the '282 patent; and claims 1, 5, and 17 of the '371 patent. These are the asserted claims.

Ollnova contends that ecobee has infringed the asserted claims by making, using, selling, importing, or offering for sale the smart thermostats called the ecobee Smart Si Thermostat, the ecobee3, ecobee3 lite, ecobee4, ecobee SmartThermostat with Voice Control, ecobee Smart Thermostat Enhanced, ecobee Smart Thermostat Premium, and additionally, Ollnova contends that ecobee has infringed claims 1 and 2 of the '495 patent by making, using, selling, or importing or offering for sale the remote sensor device called the ecobee SmartSensor.  I'll refer to these as the accused products. Ollnova contends that it's entitled to money damages in the form of a reasonable royalty for ecobee's infringement. ecobee has the burden to prove these issues by a preponderance of the evidence.

ecobee denies that it infringes any of the asserted claims.  ecobee denies that it makes, uses, offers for sale, sells, or imports any accused product that infringes any of the asserted claims.  ecobee also denies that it owes Ollnova any money damages.

ecobee contends that the asserted claims of the '495 patent are not eligible for patent protection because they involve no more than well-understood, routine, and conventional activities understood by a person of skill in the art as of April the 9th, 2004.  ecobee also contends that claims 1 and 2 of the '495 patent and claims 1, 3, 6, and 21

1229

of the '282 patent are invalid as being anticipated or as being rendered obvious by the prior art. ecobee has the burden to prove lack of patent eligibility and invalidity by clear and convincing evidence.

Patent eligibility, invalidity, and infringement are separate and distinct issues. Your job is to decide whether ecobee has infringed the asserted claims and whether those claims are ineligible or invalid. Now, if you decide that any asserted claim has been infringed and is neither ineligible for patent protection or invalid, you'll then need to decide what amount of money damages, if any, to be awarded to Ollnova to compensate it for that infringement.

But before you can decide many of the issues in this case, you need to understand the role of the patent claims. Patent claims are those numbered sentences at the end of each patent. And as you are aware, you each have a complete copy of all four of the patents-in-suit in your juror notebooks, which you may refer to during your deliberations. The claims are important, ladies and gentlemen, because it's the words of the claims that define what a patent covers. The figures and the text in the rest of the patent provide a description and/or examples of the invention, and they provide a context for the claims, but it is the claims themselves that define the breadth of the patent's coverage. Each claim is effectively treated as if it were a separate patent, and each

claim may cover more or less than another claim.  Therefore, what a patent covers depends, in turn, on what each of its claims covers.

You'll first need to understand what each claim covers in order to decide whether or not there is infringement of the claim, and to decide whether or not the claim is invalid.  Now, the law says it's my role to define the terms of the claims, and it's your role to apply my definitions to the issues that you're asked to decide in this case.  Therefore, as I explained at the start of the trial, I've already determined the meanings of certain claim language, and I've provided to you my definitions of that certain claim language in your juror notebooks.  These definitions are there and you must accept those definitions for these words in the claims as being correct.  And it's your job to take the definitions that I've supplied and apply them to the issues that you are asked to decide, including the issues of infringement and invalidity.  You should disregard any evidence presented during the trial that contradicts or is inconsistent with the constructions and definitions that I have given you.

Also, my interpretation of the claims should not be taken by you as an indication that I have any view regarding the issues of infringement, eligibility, or invalidity.  The decisions regarding these issues, infringement, eligibility, and invalidity, are yours to make as the jury.

Now, for claim language or limitations that I have not defined or construed, you are to use the plain and ordinary meaning of those limitations and that language as understood by one of ordinary skill in the art, which is to say, in the field of the technology of the patent, at the time of the alleged invention.  The meaning of the words of the patent claims must be the same when deciding both infringement and invalidity.

Now, several times during these instructions, ladies and gentlemen, I've referred to or will refer to a person of ordinary skill in the field of the invention or a person of ordinary skill in the art.  In deciding the level of ordinary skill in the field, you should consider all the evidence introduced at trial, including but not limited to:  1, the levels of education and experience of the inventor and other appearance actively working in the field; 2, the types of problems encountered in the field; 3, previous solutions to those problems; 4, the rapidity with which innovations are made; and 5, the sophistication of the technology.

The claims are intended to define, in words, the boundaries of the inventor's rights.  Only the claims of a patent can be infringed.  Neither the written description, nor the drawings can be infringed.  Now, each claim must be considered individually.

And I'll now explain to you how a claim defines what it

covers.

A claim sets forth, in words, a set of requirements. Each claim sets forth its requirements in a single sentence. If a product satisfies each of these requirements, then it is covered by the claim. And there can be several claims in a patent. Each claim may be narrower or broader than another claim by setting forth more or fewer requirements. The coverage of a patent is assessed on a claim-by-claim basis. In patent law, the requirements of a claim are often referred to as the claim elements. They are often also called the claim limitations. When a product meets all of the requirements of a claim, the claim is said to cover that product, and that product is said to fall within the scope of that claim. In other words, a claim covers a product where each of the claim elements or limitations are present in that product. If a product is missing even one limitation or element of a claim, the product is not covered by the claim. And if the product is not covered by the claim, that product cannot infringe that claim.

Now, the beginning portion or preamble of a claim often uses the word 'comprising'. The word 'comprising' when used in the preamble means including but not limited to or containing but not limited to. When comprising is used in the preamble of a claim, if you decide that an accused product includes all of the requirements of that claim, the claim is

infringed, and this is true even if the accused product contains additional elements or features.

For example, a claim to a table comprising a tabletop, legs, and glue would be infringed by any table that includes a tabletop, legs, and glue, even if the table contains other structures, such as leaves that would expand the size of the tabletop or wheels that would go on the ends of the legs.

Now, this case involves two types of plant claims: independent claims and dependent claims.  In this case claim 1 of the '887 patent, claim 1 of the '495 patent, claim 1 of the '282 patent, and claims 1 and 17 of the '371 patent are independent claims.  Claims 11, 12, and 20 of the '887 patent, claim 2 of the '495 patent, claims 3, 6, and 21 of the '282 patent, and claim 5 of the '371 patent are dependent claims.

An independent claim sets forth all the requirements that must be met in order to be covered by that claim.  It's not necessary to look at any other claim to determine what an independent claim covers.

However, a dependent claim does not itself recite all the requirements of the claim, but refers to another claim for some of its requirements.  In this way, the claim depends on another claim.  A dependent claim incorporates all the requirements of the claim to which it refers, or as sometimes stated, from which it depends.  The dependent claim then adds its own additional requirements.  So to determine what a

dependent claim covers, it's necessary to look at both the dependent claim itself and any other claim to which it refers or from which it depends.  A product that meets all the requirements of both the dependent claim and the claim to which it refers or from which it depends is covered by the dependent claim.

I'll now instruct you on how to determine whether or not Ollnova has proven that ecobee has infringed the asserted claims of the asserted patents.  If a person or a corporation makes, uses, sells, or offers to sell within the United States or imports into the United States what is covered by a patent claim without the patent owner's permission, that person or corporation is said to infringe the patent.

In this case, Ollnova has alleged that ecobee directly infringes the asserted claims of the patents-in-suit.  Ollnova also alleges that ecobee indirectly infringes the asserted claims of the patents-in-suit.

In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed.  You must compare the claims of the asserted patents as I have construed them to the accused products and determine whether or not there is infringement.  This, ladies and gentlemen, is the only correct comparison.

You should not compare the accused products with any specific example set out in the patent or in the prior art in

reaching your decision on infringement.  In deciding infringement, the only correct comparison is between the accused products and the elements or limitations of the claims as the Court has construed them.  You must reach your decision on each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by both of the parties over the course of the trial.

I'll now instruct you on the specific rules you must follow to determine whether Ollnova has proven that ecobee has directly infringed one or more of the patent claims involved in this case.

In order to prove direct infringement of a patent claim, Ollnova must show by a preponderance of the evidence that an accused product includes each and every limitation of the claim.  In determining whether the accused product directly infringes a patent claim in this case, you must compare the accused product with each and every one of the limitations or requirements of that claim to determine whether the accused product contains each and every requirement or limitation recited in that claim.  An accused product infringes a claim if it is reasonably capable of satisfying the claim elements even though it may also be capable of non-infringing modes of operation.

A patent can be directly infringed even if the alleged

direct infringer did not have knowledge of the patent and without the direct infringer knowing that what it did was infringement of the claim.  A patent may also be directly infringed even though the accused direct infringer believed in good faith that what it did was not infringement of the patent.  Infringement does not require proof that a party copied its product from the asserted claims.

Now, you must determine separately for each asserted claim whether or not there is infringement.  However, if you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim.  On the other hand, if you find that an independent claim has been infringed, you must still decide, separately, whether the product meets the additional requirements of any claims that depend from that independent claim--that is, whether those claims have also been infringed.  A dependent claim includes all the requirements of any of the claims to which it refers or from which it depends plus the additional requirements of its own.

Now, a claim requirement is literally present if it exists in an accused product just as it is described in the claim language, either as I've explained that language to you, or if I did not explain it, as it would be understood by its plain and ordinary meaning to one of ordinary skill in the

art.  If an accused product omits any element recited in a claim, ladies and gentlemen, then you must find that the product in question does not literally infringe that claim.

As long as an accused product has each and every one of the claim requirements, infringement of that claim is shown, even if the product contains additional features or elements not required by the claims.

I'll now instruct you on indirect infringement.  There are two types of indirect infringement--induced infringement and contributory infringement.

In this case, Ollnova has accused ecobee of indirect infringement by actively inducing its customers to directly infringe the asserted claims of the asserted patents.  As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.  ecobee is liable for induced infringement of a claim only if Ollnova proves by a preponderance of the evidence that:

1.  Acts have been carried out by Ollnova customers that directly infringe that claim;

2.  ecobee has taken action during the time the asserted patent was in force, intending to cause the infringing acts by its customers; and.

3.  ecobee has been aware of the asserted patents and has known that the acts of its customers constitute infringement of the asserted patents, or was willfully blind to that

infringement.

Willful blindness, ladies and gentlemen, is established if ecobee believed there was a high probability that the acts, if taken, would constitute infringement of the asserted claims, but deliberately avoided confirming that belief.

To establish induced infringement, it is not sufficient that someone else directly infringes a claim. Nor is it sufficient that the company accused of inducing another's direct infringement merely had knowledge or notice of an asserted patent or had been aware of the acts of another that allegedly constitute direct infringement. And the mere fact that the company accused of inducing another's direct infringement had known or should have known that there was a substantial risk that someone else's acts would infringe is not sufficient. Rather, in order to find inducement, you must find that ecobee specifically intended or was willfully blind to that infringement.

Now, Ollnova also alleges that ecobee is liable for contributory infringement by contributing to the direct infringement of the asserted claims by ecobee customers. As with direct infringement and induced infringement, you must determine contributory infringement on a claim-by-claim basis. ecobee is liable for contributory infringement of a claim if Ollnova proves by a preponderance of the evidence as follows:

1. ecobee sells, offers to sell, or imports within the

United States the accused products, during the time the asserted patents were in force;

2. The accused products are not a staple article or commodity of commerce suitable for substantial non-infringing use;

3. The accused products constitute a material part of the inventors -- of the inventions claimed in the asserted patents;

4. ecobee is aware of the asserted patents;

5. ecobee knows that the accused products are especially made or adapted for use as an infringement of an asserted claim of the asserted patents; and,

6. ecobee customers use accused products to directly infringe an asserted claim of the asserted patents.

I'll now instruct you about the rules that you must follow in deciding whether or not ecobee has proven that the asserted claims of the '495 patent are ineligible for patent protection, and whether ecobee has proven that the asserted claims of the '282 patent and the '495 patent are invalid.

An issued United States patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard referred to as the PTO or the Patent Office, acted correctly in issuing the patent. This presumption of validity extends to all issued United States patents.

In order to overcome this presumption, ecobee must establish by clear and convincing evidence that a claim is either ineligible for patent protection or invalid.

To succeed on its claims for patent ineligibility, ecobee must establish two things.  The first is whether the claims are directed to an abstract idea.  That issue is one for the Court to decide and not the jury.  It is not something you will have to decide in this case.

However, you, the jury, will decide the second question related to patent eligibility.  Specifically, and in that regard, ecobee must show that the claims involve nothing more than the performance of activities which a person of ordinary skill in the art would have considered well-understood, routine, and conventional at the time the patent application was filed.  You, the jury, will determine this issue.

To meet its burden on this issue, ecobee must show by clear and convincing evidence that the asserted claims of the '495 patent involve only technology which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional as of April the 9th, 2004.  The mere fact that something was known in the art at the time does not necessarily mean that it was well-understood, routine, and conventional.  Rather, the test is whether, in view of all the evidence, a person of ordinary skill in the art would have considered the claim to involve only technology that was

well-understood, routine, and conventional as of April the 9th, 2004.

You should consider all the evidence presented during this trial, including the testimony of the witnesses as well as the exhibits introduced, including the specifications within the patents-in-suit. If the evidence shows by clear and convincing evidence that the elements of the asserted claims, when taken individually or when taken as an ordered combination, involve only technology which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional, then this element of patent ineligibility has been established.

As I explained earlier, in order to overcome the presumption of validity, ecobee must establish by clear and convincing evidence that a claim is invalid. Like infringement, invalidity is determined on a claim-by-claim basis. You must determine separately for each claim whether that claim is invalid. If one claim of a patent is invalid, this does not mean that any other claim is necessarily invalid.

Claims are construed the same way for determining infringement as for determining invalidity. You must apply the claim language consistently and in the same manner for the issues of infringement and for the issues of invalidity. In making your determination as to invalidity, you should

consider each claim separately.

As I explained earlier, a previous device, system, method, publication, or patent that predates the claimed invention is generally called prior art and may include items that were publicly known or that have been used or offered for sale, or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention.  Prior art may be authored or created by anyone, ladies and gentlemen.  In evaluating the prior art to determine whether an invalidity defense has been proven by clear and convincing evidence, you may consider whether that prior art was or was not before the PTO, the Patent Office.

I'll now instruct you on how to determine whether any of the asserted claims of the '495 patent and the '282 patent are invalid as anticipated.

In order for someone to be entitled to a patent, the invention must actually be new, and the inventor must not have lost his or her rights by delaying the filing of an application claiming the invention.  In general, inventions are new when the identical method has not been used or disclosed before.

ecobee contends that claims 1, 3, 6, and 21 of the '282 patent and claims 1 and 2 of the '495 patent are invalid because the claimed inventions were not new.  In other words, ecobee contends that the patents are anticipated by the prior

art.  Anticipation requires that all of the requirements of a patent claim be disclosed in a single prior art reference. Also, that single prior art reference must disclose all elements of the claim arranged or combined in the same way as in the claim--as the claim has been construed or interpreted by the Court.  ecobee must prove by clear and convincing evidence that an asserted patent claim was anticipated by the prior art reference.  Anticipation must be determined on a claim-by-claim basis.

To anticipate the invention, the prior art does not have to use the same words as the claim, but all the requirements of the claim must have been disclosed, either stated expressly or implied, to a person having ordinary skill in the art in the technology of the invention, so that looking at that one single reference, that person could make and use the claimed invention.  Keep in mind that ecobee may not establish anticipation by arguing that the accused products practice the prior art, or by comparing the accused products to a prior art reference.  An item of prior art may anticipate without explicitly disclosing a feature of the claimed invention, if that missing characteristic is necessarily present, or inherent, in the single anticipating reference.

I'll now instruct you on how to determine whether any of the claims of the '495 or the '282 patents are invalid as being obvious.

Even though an invention may not have been identically disclosed or identically described in a single prior art reference before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

ecobee contends that claims 1, 3, 6, and 21 of the '282 patent, and claims 1 and 2 of the '495 patent are invalid because the claimed inventions are obvious in the light of the prior art.

ecobee has the burden of establishing obviousness by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of the technology of the patent.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field that someone would have had at the time the invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention. Keep in mind, ladies and gentlemen, that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness.  Most, if not all, inventions rely on the building blocks of prior art.  The skill of the actual inventor is not necessarily relevant

because inventors may possess something that distinguishes them from persons having ordinary skill in the art.

In considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art.  The scope and content of the prior art for deciding whether the invention was obvious includes at least prior art in the same field as the claimed invention.  It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention.

Further, teachings, suggestions, and motivations may also be found within the knowledge of a person of ordinary skill in the art including references -- excuse me-- including inferences and creative steps that a person of ordinary skill in the art would employ.  A person of ordinary skill may be able to fit the teachings of multiple pieces of prior art together like pieces of a puzzle.  The person of ordinary skill in the art would have the capability of understanding the scientific and engineering principles applicable to the prior art, to the pertinent art.

In considering whether a claimed invention is obvious, you may, but you're not required to find obviousness if you find that at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field to combine the known elements in a way the

claimed invention does, taking into account such factors as:

1.  Whether the claimed invention was merely the predictable result of using prior art elements according to their known function;

2.  Whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3.  Whether the prior art teaches or suggests the desirability of combining elements in the claimed invention;

4.  Whether the prior art teaches away from combining elements in the claimed invention;

5.  Whether it would have been obvious to try the combination of elements in the claimed invention, such as when there is a design need or market pressure to solve a problem, and there are a finite number of identified, predictable solutions; and,

6.  Whether the change resulted more from design incentives or other market forces.

To find the invention obvious, you must find that the prior art provided a person having ordinary skill in the field a reasonable expectation of success.  Obvious to try is not sufficient in unpredictable technologies.

Now, in determining whether the claimed invention was obvious, consider each claim separately.  Do not use hindsight, and consider only what was known at the time of the invention.  In other words, you should not consider what a

person of ordinary skill in the art would know now or what has been learned from the teachings of the asserted patents.

In making these assessments, you should take into account any objective evidence, sometimes called secondary considerations, that may have existed at the time of the invention, and afterwards, that may shed light on the obviousness or not of the claimed invention.  The following are possible secondary considerations, but it's up to you, ladies and gentlemen, to determine whether secondary considerations of non-obviousness exist at all.

These factors are:

1.  Whether the invention was commercially successful as the result of the merits of the claimed inventions, rather than the result of design needs or market pressures, advertising, or similar activities;

2.  Whether the invention satisfied a long-felt need;

3.  Whether the inventor proceeded contrary to acceptable wisdom in the field;

4.  Whether others tried, but failed, to solve the problem solved by the claimed invention;

5.  Whether others invented the invention at roughly the same time;

6.  Whether others copied the claimed invention;

7.  Whether others accepted licenses under the patents-in-suit because of the merits of the claimed

invention;

8. Whether the claimed invention achieved unexpected results;

9. Whether others in the field praised the claimed invention;

10. Whether there were changes or related technologies or market needs contemporaneous with the invention; and,

11. Whether persons having ordinary skill in the art at the time of the invention expressed surprise or disbelief regarding the invention.

These factors are relevant only if there is a connection or nexus between the factors and what differentiates the claimed invention from the prior art. Ollnova has the burden of establishing this connection or nexus. Moreover, even if you conclude that some of the above indicators of objective evidence have been established, those factors should be considered along with all the other evidence in the case in determining whether ecobee has proven that the claimed invention would have been obvious.

In support of obviousness, you may also consider whether others independently invented the claimed invention before or at about the same time as the named inventor thought of it. In making these determinations a person of ordinary skill uses simple common sense, and can rely upon the inferences and creative steps that a person of ordinary skill in the art

would employ.  Also, ecobee does not need to show that one of ordinary skill would actually have combined the physical structures of two references; one need only combine the teachings.  Remember, as stated earlier, that prior art is not limited to patents and published materials, but includes the general knowledge that would have been available at the time to one of ordinary skill in the field of the invention.  If you find that ecobee has proven the obviousness of a claim by clear and convincing evidence, then you must find that claim is invalid.

If you find that ecobee has infringed any valid claim of the asserted patents, then you must consider what amount of damages, if any, to award to Ollnova.

I'll now instruct you about the measure of damages.

By instructing you on damages, I am not suggesting which party should win this case on any issue.  If you find that ecobee has not infringed any asserted claims, then Ollnova is not entitled to damages.  Similarly, for any claim that is infringed and is also ineligible or invalid, Ollnova is not entitled to any damages for infringement of that claim.

Ollnova has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that Ollnova establishes that it more likely than not suffered as a result of ecobee's infringement.  While ecobee is not required to prove the

amount of its damages with mathematical precision, it must prove them with reasonable certainty.  Ollnova is not entitled to damages that are remote or that are only speculative.

The damages that you award, if any, ladies and gentlemen, must be adequate to compensate Ollnova for any infringement that you may find.  You must not award Ollnova more damages than are adequate to compensate it for the infringement.  You must also not include any additional amount for the purposes of punishing ecobee or setting an example.

I'll now instruct you on how to calculate reasonable royalty damages.

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when infringement first began.  In this case, the patent holder for the purposes of the hypothetical negotiation is Siemens, and the alleged infringer is ecobee.  In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.  In determining this, you must assume that both parties believed that the patent was valid and infringed and

that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred. Evidence of things that happened after infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

Now, you have heard references throughout this trial as to whether Ollnova should be entitled to a running royalty or a lump-sum royalty. If you find that Ollnova is entitled to damages, you must decide whether the parties would have agreed to a running royalty or a fully paid-up lump-sum royalty at the time of the hypothetical negotiation. A running royalty, ladies and gentlemen, is a fee paid for the right to use the patent that is paid for each unit of the infringing products that have been sold. If there are additional units sold in the future, any damages for these sales will not be addressed by you. If you decide that a running royalty is appropriate, then the damages that you award, if any, should reflect the total amount necessary to compensate Ollnova for Ollnova's past infringement. However, a lump-sum royalty is when the infringer pays a single price for a license covering both past and future infringing sales. If you decide that a lump-sum royalty is appropriate, then the damages you award, if any,

should reflect the total amount necessary to compensate Ollnova for ecobee's past and future infringement.

In deciding the reasonable royalty, you should consider all the facts known and available to the parties at the time infringement began.

Some of the kinds of factors that you may consider in making your determination are:

1.  The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty;

2.  The rates paid by the licensee for the use of other patents comparable to the patents-in-suit.  Comparable license agreements include those covering the use of the claimed invention or similar technology;

3.  The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4.  The licensor's established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

5.  The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business;

6.   The effect of selling the patented specialty and promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales;

7.   The duration of the patent and the term of the license;

8.   The established profitability of the product made under the patents, its commercial success, and its current popularity;

9.   The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

10.   The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

11.   The extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

12.   The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13.   The portion of the realizable profits that should be

credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

14.    The opinion and testimony of qualified experts; and,

15.    The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been trying to reasonably and voluntarily reach an agreement; that is, the amount which a prudent licensee--who desired as a business proposition, to obtain a license to the patented invention--would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license.

You may have heard these factors, ladies and gentlemen, referred to during the trial as the *Georgia-Pacific* factors. No one of these factors is dispositive, and you can and you should consider the evidence that has been presented to you in this case on each of these factors.  You may also consider any other factors which in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay, the patent holder would have been willing to accept, acting as normally prudent business people.

Finally, in making a reasonable royalty determination, you may also consider evidence concerning the availability, or

lack thereof, of non-infringing alternatives to the patented invention.  You may compare the patented invention to non-infringing alternatives to determine the value of the patented invention, including the utility and advantages of the patent over the old modes or devices, if any, that had been used to achieve similar results.

The law requires that any royalty awarded to Ollnova correspond to the value of the alleged inventions within the accused product, as distinct from other unpatented features of the accused product.  This is particularly true where the accused products have multiple features and multiple components not covered by the patent or where the accused products work in conjunction with other non-patented items. If unpatented features contribute to the accused products, you must apportion that value to exclude any value attributable to unpatented features.  You must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.

Whether a license agreement is comparable to the license under the hypothetical license scenario depends on many factors, such as whether they involve comparable technologies, economic circumstances, structure, scope, and context of the negotiation.  If there are differences between a license agreement and the hypothetical license, you must take those into account when you make your reasonable royalty

determination.

In calculating damages, you must consider whether or not Ollnova or its licensees marked the products that practice the asserted patents by placing on or within those products the word 'patent' or 'pat.' and the asserted patents' numbers.  If you find Ollnova or its licensees failed to properly mark their respective products, then you may only award damages to Ollnova for infringement that occurred after the date Ollnova gave actual notice to ecobee that Ollnova believed ecobee was infringing the asserted patents.  It will be up to you to determine when such notice occurred.

Ollnova has the burden of establishing that it substantially complied with the marking requirement.  This means Ollnova must show that it made consistent and continuous efforts to ensure that its licenses who made -- licensees who made, offered for sale, or sold the products under the patents-in-suit marked the products.

ecobee contends that the APOGEE system provided by Siemens Building Technologies, Inc., is a product that should have been marked with the '282, '887, and '371 patent numbers. The parties agree that the APOGEE system was not marked with those patent numbers.  Ollnova has the burden to prove by a preponderance of the evidence that the APOGEE system does not practice any of the '282, '887, and '371 patents.  This is an issue that you must decide.

If you determine that Ollnova did not substantially comply with the marking requirement and if you find that any of the '282, '887, and '371 patents are valid and infringed, you should calculate damages for those patents beginning on March the 21st, 2022.

If you find that Ollnova did substantially comply with the marking requirements, then you should calculate damages for the '282, '887, and '371 patents beginning on March the 8th, 2016.

THE COURT:  Now with these instructions, ladies and gentlemen, we'll proceed at this time to hear closing arguments for the attorneys for the competing parties.

The Plaintiff may now present its first closing argument to the jury.

Would you like a warning on your time Ms. Fair?

MS. FAIR:  Yes, Your Honor.

If I may have a warning when I've used 25 minutes, please.

THE COURT:  I'll warn you when you have used 25 minutes.

You may proceed with your argument when you are ready.

MS. FAIR:  Thank you, Your Honor.

Good morning.  I know this has been an imposition on your time.  You've provided a service.  Jury duty is a service to the judicial system, but in this case it's a service to us as

well.  This dispute is important to us and we appreciate your time, so I want to start by thanking you.

At the beginning of this case, we told you about the evidence that we were going to bring to you, and ecobee told you that a lawsuit is a story.  I think that was an introduction to what was going to happen in this case.  We brought you evidence and they brought you stories.  And I want to spend a little bit of time right now highlighting some of what I think will make your job a little bit easier, showing you the evidence we brought and the stories they brought; stories that aren't relevant, stories that WE think wasted your time and tried to distract you from what really mattered.

So the patents in this case, they came from Siemens.  And we learned that Siemens was working on systems and buildings that had hard wires in them, and they saw that something was coming--wireless; controllers and sensors were going to be connected wirelessly, and in that context they'd have new problems, and Siemens solved those problems.

The first question here is infringement, and so I want to talk about how ecobee's controllers and sensors use the same technology that Siemens invented back in 2004, 2007, and 2008, because that is something that matters.

So, you remember Doctor Madisetti took the stand and he explained to us about how ecobee's products work.  They have thermostats that connect wirelessly to the sensors through

radio communications protocols, the green network we see here. And then the thermostat connects to WiFi.  He told us about how all of these components work together--the sensor sends messages to the thermostat, the thermostat sends messages to the server, the server sends messages back, maybe control information it gets from your phone.

Now, I just tried to tell you in a couple of sentences something that's pretty complicated.  Doctor Madisetti spent a lot of time before he took the stand studying the documents, figuring out how the technology worked.  It was a lot of work. It was a lot of work for him on the stand.  He spent several hours on the stand on Monday.  You remember it.  Started mid afternoon, mid morning, went well into the afternoon.  It was dense at times.  He went through every limitation of every claim.  He showed you the evidence.  We walked through all of it.  You remember it.  It wasn't short and it wasn't easy, but he did the hard work.  We did that because it's our burden. We did that because ecobee wouldn't admit a single limitation of a single claim was there.

It ended up that when Doctor Souri took the stand there were only a few challenged limitations, but Doctor Madisetti explained why they were wrong.  I don't want to waste your time, but I do want to touch on each of the patents and a couple of things that we heard about them.

So you remember the '495 patent, the two wireless

networks patent.  Doctor Madisetti showed us how there's two networks, two different protocols, and how they connect.

What did we hear?

We heard something that was a little bit surprising to me.  ecobee told us, well, some of the customers, maybe they don't have WiFi.  Does that even make sense?

ecobee prides itself on being a smart thermostat company, the first one to the market.  The whole point is that it connects wirelessly to the internet.  You can control it from your phone.  You can use the sensors wirelessly.

Does it make sense to you that they're intending for their customers to just put it on the wall because it looks nice?

That doesn't make any sense.

Doctor Madisetti explained that when one network goes down the '495 patent provides a mechanism for things to keep functioning--two wireless networks, you've got a back-up, everything keeps working.  You still have your air conditioning.

We also heard about the '887 patent.  This was the one, remember, where he talked about is the transmission suspended.  Right?  We talked about it yesterday.  Doctor Madisetti explained the message is suspended.

And how do we know that?  We know that because the message is coming from the thermostat, the source code and in

the thermostat tells us it starts putting the message together it starts getting ready to send it and then it's suspended, it's stopped.  Remember, Doctor Madisetti told us about it's like the letter, you take it to the post office, you stick it in your pocket and decide I'm not going to send it.

There was one software engineer who testified in this case from ecobee about the thermostat code.  It wasn't Mr. Hietala.  He talked about server site code.

You remember what happened in the deposition?

It was brief.  It was 10 minutes.  It was on Monday. Mr. Curtin, ecobee's software engineer for the thermostat, explained exactly what Doctor Madisetti said--the transmission is suspended.  You stick it in your pocket instead of mailing it.

The '282 patent.  Remember this is the one where you get two sensors in one.  It's a combined multi-sensor package. And the question that ecobee raised was, well, is it a portion of the data or is it all of the data that's sent.  So what we're looking at are these status change messages and the interval status messages.  And what we know is that these messages send average temperature.

Where does the average temperature come from?

It comes from the sensors.

And what do we know from ecobee's documents?

The user has complete control over which sensors are used

to calculate that average.  You choose two sensors, you send a portion of the data.  That's claim 1.  You choose three sensors, all three of them, that's all the data, claim 6.  Both are infringed.  You can pick two ice cream flavors you can pick three of them--it all infringes.

And lastly was the '371.  The highlighted part of this claim is what was the focus of ecobee's arguments.  This was where Doctor Souri tried to tell you they don't infringe because they don't send the same message repeatedly--we got to have that same message.  What did they know before they made this argument?

The words 'same message' are not there.  They're not in the claim.  The claim is what matters, and ecobee was trying to set up a false test for infringement.

The Court just told us you compare the claims of the patent as the Court construes it to the accused products, not as Doctor Souri construes it.  And he even admitted.  That's what he was trying to do--add to the claim.

He was asked:  "Did you say during your testimony today that the word 'same' was a word in the claim?"

He says:  "It's not a word that's explicitly in the claim, but that doesn't mean the claim doesn't require the same message."

Is that the law?

That's not the law.  The test is the claim language.

This issue of same message I think is a good example of something that can simplify the infringement question for us, and that's credibility.  You-all are the ones who are going to judge the credibility of the witnesses.  The technology is complicated, but I don't think the question of credibility is, especially when we look at Doctor Madisetti compared with Doctor Souri.  And the question is what's more likely than not, which one do you think is correct.

So we had Doctor Madisetti.  He was on the stand and on cross examination -- you remember when ecobee was cross examining him they wouldn't even let him look at the claim language?

When Doctor Souri took the stand you remember the true/false?

The question was on the screen for Doctor Souri.  It was an open-book test based on a report he wrote.  We let him look at his report every time, and he still couldn't answer the question.

Who are you going to believe?

Let's talk about what they did use to attack Doctor Madisetti, because I think this is an example of stories that wasted time, that weren't relevant.

Did they confront him on the technology?  No.

They wasted time criticizing him for not being in their industry.  You remember that?

They did it with every one of our witnesses.  They made sure to point out Mr. Padian's not in the smart thermostat industry, Doctor Madisetti's not in the smart thermostat industry, Mr. Bergman's not in the smart thermostat industry.

Does that matter?

The whole point of patents is that you have a deed to property.  It's public, it's available, it's at the Patent Office, and anybody of skill can read the boundaries, can read the claims and know what infringes.  It doesn't matter if you're a smart thermostat seller or not, it doesn't matter if you talk to the inventors--the claim language is what matters.

One other thing that they spent a lot of time on was source code.  Y'all Remember this?

They made a big deal about there's 10 million lines out there and Doctor Madisetti only looked at some of it.

But what did we learn?

We learned that he sent a specific expert to go find the functionality that mattered, the functionality in the thermostat, and that expert found it.

And how do we know that?

We're looking for the messages that the thermostat is sending and receiving.  Where do you think the code is that matters?

It's in the thermostat.

We also know that the right code was there because ecobee

had all the code, and they didn't bring anything else out that Doctor Madisetti hadn't already talked about.  Doctor Souri admitted there was not a single page of code presented in rebuttal to what Professor Madisetti printed.

Isn't that right?

That's correct.

So what did they do?

They wasted your time with Mr. Hietala.  He was a nice guy.  He came down and he told us about some of the good things that he's written in the server code.  They spent an hour with him, for who knows what reason, because he admitted he hasn't worked on the code that's in the thermostats where the messages are being sent and received that matters.  He's not familiar with that code.  He doesn't know anything about the source code on the thermostat.

They're distracting us with irrelevant information.

The other theme that was a little puzzling to me from ecobee, the other distraction, was they started asking Doctor Madisetti and they brought this out throughout the case about, well, ecobee doesn't sell the air handler, the furnace, the WiFi router, the internet services.

Nobody says they sell that.  What's accused in this case are the thermostats and the sensors.

They did this over, and over, and over again.  It has nothing to do with whether or not they're on our property.

1266

Look at the patent claims.  They don't talk about wires, they don't talk about your HVAC unit.  They talk about controllers and sensors.  That's what's accused and that's what we should be looking at.

So with all of that evidence, when you weigh the credibility, we ask that you check yes to question 1--did Ollnova prove by a preponderance of the evidence that ecobee infringed any of the asserted claims.  We proved they directly infringed because they sell the infringing thermostats and sensors, they induce infringement because they want their customers to use them, and to use them in an infringing way, use the connectivity; and there's contributory infringement because there's no substantial non-infringing use.  That's the whole point of the product.

The next question that you're going to be asked is invalidity.  What's invalidity?  What does this mean?

ecobee is asking you to overrule the Patent Office.  There's a presumption of invalidity and they have to overcome it, because what they're asking you to do is to take a piece of property that the Patent and Trademark Office says is valid and tear it up and say they got it wrong.  And to do that they have a higher burden--clear and convincing evidence.  This means an abiding conviction that the truth of their contentions are highly probable, an abiding conviction.

So what did they bring you?

You remember Doctor Martens?

He took the stand yesterday, and he started out by telling us, well, the Patent Office didn't have the benefit of my independent analysis.  I want you to think about who's independent.  You have the Patent Office with examiners who review the applications, they go look for prior art, as we saw in the patent video last week, and they make a determination should this patent be granted or shouldn't it.  Mr. Hietala himself, their software engineer, said not all the patents make it out of the Patent Office.  There's no motivation there.

Doctor Martens, on the other hand, took the stand, being paid several hundred dollars an hour, explaining to you prior art that the lawyers fed him, and then told you, well, the Patent Office didn't have the benefit of my independent analysis.

Is that independent?

That's not independent.

And remember how they pointed out none of our witnesses are in their industry?

You remember what Doctor Martens does?

He's an MBA who worked in munitions, explosions, fire systems.  He's not in the smart thermostat industry either. And then they whipped through his presentation in a little more than an hour.  They spent more time with Mr. Hietala on

server code, with Mr. Laurence on hardware, none of which mattered, and then they spent an hour saying, well, you should overrule the Patent Office, they got it all wrong, trust me, the lawyers fed me the right prior art.

Is that an abiding conviction?

I don't think so.

They started out with the '495 patent.  You're going to be asked did they prove that it's well-understood, routine, and conventional.  The answer is no.  The '495 is the two network patent.  So we're talking about sensors and thermostats communicating with each other.  ecobee prides itself on being the first smart thermostat company.

And remember what Mr. Banderk said about the remote sensor when it came out?

He characterized it as a dramatic innovation.  That was in 2014--10 years after the '495 patent.  And now ecobee wants to stand up here and tell you that it's well-understood, it's routine, it's conventional.

They're doing it the old way?

I don't think that's an abiding conviction.

The next invalidity arguments they made, they took a couple of patents and they put one figure up on the screen and said, hey, look, it's all there, all of the '495 claim is there, all of the '282 claim is there.  They did it all with one figure from the prior art.

You notice an inconsistency there?

We spent all this time with Doctor Madisetti, we brought all this proof for infringement, more likely than not, and then when it's time for them to show up with evidence that's clear and convincing they show you one figure and say, oop, all there, the Patent Office got it wrong, tear it up.  That's not an abiding conviction.

There's one other thing I want to point out about invalidity.  At the beginning in opening statements when the parties told you what the evidence was going to be, they told you that Doctor Martens studied the patents and he was going to tell you why they were invalid.

You remember how many patents are at issue in this case?

There's four.

Did they follow through and present evidence on invalidity of all four patents?

No.  They stood up in opening, they told you they were going to do it, and then they didn't.  We saw not a shred of evidence on invalidity on the '887 or the '371.  Remember, credibility matters.  You got to follow through when you say you're going to do something.

And so on invalidity, we ask that you check no--they did not prove the claims are invalid as anticipated or obvious; none of them.

The last issue is damages.  And on whose presentation to

believe, I think the statute tells us everything we need to know. Reasonable royalty for the use made of the invention by the infringer. There was on one damages expert who considered use. You remember Mr. Bergman's analysis. It was detailed. It was as thorough as it could be with the available information. And it wasn't simple, it wasn't, hey, let's put a range in place that looks mysteriously like a couple of purchase prices.

First he showed us cost savings. He went through in detail how much would it cost if ecobee had to try and provide the same benefit but couldn't use the patents.

And how did he know what technology to use to not use the patents? What's the best alternative that's not infringing?

They told us. Take two with sensors -- take one sensor, split it into two. You got two networks, just use one, make sure the communications don't interfere. And they gave us cost information. And they gave us sales information. And Mr. Bergman looked at all of that. He looked at the number of sensors that were sold. He looked at the cost. He got with Doctor Madisetti and said what parts matter, how are we going to put together what they say is the next best way to do it if you can't have the patent. And these are calculations based on use. It totaled $46,582,054.

Well, what were their criticisms?

First they said, well those alternatives you looked at,

those aren't right.  Those are no good.  Nobody will like them.  It's not going to work in this industry.  You don't know, you're not in the smart thermostat industry.

Remember where we got them?

We saw this interrogatory.  We asked them:  What's the next best way to do this?

And they said:  Individual sensors, don't package them in one device, and just use one network.

What did they say to that?

Well, we've never tried it any other way and we never would.

What does that mean?

That means these patents are so important you can't do it without them.  If anything, it means they're more valuable.

The other approach that Mr. Bergman had was based on the Carrier license.  And what do we know about this license?

We know that it was a one-on-one negotiation.  We know that when the parties entered into it, they had access to confidential information of each other to what usage Carrier had of the technology.  And we know that those negotiations were about smart thermostats.  Mr. Padian told us that.  He negotiated the deal.

Mr. Bergman took the amount, I can't say it in open court, he adjusted it for market size, he adjusted it for the number of patents, he considered how long the license terms

1272

were.  He did all of this analysis to evaluate Carrier's use based on what we had available and ecobee's use based on what we have available.  He did those adjustments to look at use.

What's the value of ecobee's use?

ecobee's criticism said, well, Carrier may be small in smart thermostats but they're a giant company, they sell lots of products, they have all this HVAC equipment.

Did a single expert take the stand or a single witness take the stand and suggest that the air conditioner sitting outside is relevant to these patents?

No.  That license was for smart thermostats and sensors.

Then they say, well, you remember that market adjustment, the Jungle Scout report?

They were pretty critical of Mr. Bergman's use of that.

But remember where it came from?  It came from ecobee.

It's the only evidence in this case comparing how many thermostats Carrier sells to how many thermostats ecobee sells.

And what did we have?

We even had Mr. Banderk, the chief marketing officer, the chief financial officer of ecobee, he's got a whole team of people in the industry whose job is watching market trends, looking at the financials, looking at where they stack up, what do the customers want and how do we compete.

Were you waiting for him to show us some better

1273

information after they were so critical of the Jungle Scout document?

Were you surprised when he showed us nothing better?

They do extensive research, and did he have any evidence on the other side of the scale against the only evidence they provided?  No.

Remember what he said?

He accused Ollnova of not doing its homework.  It's kind of funny to me they said that in light of their damages model that looks mysteriously similar to just taking two purchase prices, sticking them on either end, and saying that's all we need, lump sum, it's right there in that range.

THE COURT:  25 minutes have been used.

MS. FAIR:  Thank you, Your Honor.

That's not doing your homework.

These purchase agreements are irrelevant.  And how do we know that?

Mr. Schoettelkotte told us about the book of wisdom.  He admitted we can look -- at the hypothetical negotiation in 2012, we look into the future, we can consider future events and bring it back to the hypothetical negotiation.  That means we know what Siemens didn't know when it sold the patents.  We know about ecobee's use.  We know about their sales.  We know about the value that they get from these patents.  Siemens didn't have that information.  Ollnova didn't have that

information when they bought the patents.  The purchase price is irrelevant.

You have the *Georgia-Pacific* factors.  You'll have them available to look at.  There's 15 of them.  And in all 15 factors nowhere does it talk about purchase price for the patents.  It's talking about licenses, royalties.  That's what we should be looking at.

If Exxon pumps millions of barrels of oil out of your property, do they get to come and say, well, you only paid $100,000 for it so we don't have to pay any more than that because we could have just bought the property?

That's not reasonable and it's not tied to use.

Then they told you about a package deal.  I can't say the name of it in open court, but you remember.  You remember what it was.  So the hypothetical negotiation is two parties one-on-one.  Looks like the Carrier negotiation.  The package deal looks nothing like that.  Seventeen parties on one side, seventeen on the other.  Does that look comparable?

And of the two licensees that they singled out, nobody knows what they paid, nobody had any of their confidential information, nobody knows what their usage was.  This agreement has nothing to do with it.

The form of the damages in this case also tells us something about use.  They want to say it's a lump sum, one-time payment upfront, doesn't know what the usage is,

1275

doesn't matter what the start date of damages is.  None of that matters.  A running royalty is pay as you go and it's the way to do it.

We also know that at the hypothetical negotiation Siemens is on the other side from ecobee, and we know from ecobee's licenses they have two licenses with other sophisticated tech companies that have a presence in the smart thermostat industry just like Siemens.

And what form was the license payment in those?

A running royalty.

So when you get to question 4 on damages we ask that you go with what Mr. Bergman presented because it reflects use--$46,582,054.  That's for past damages.  You heard the Court say if you do a running royalty, future damages will be dealt with in the future.  They'll pay for their use as they go.

There's one last question you're going to be asked and that's going to be the date that damages begin.  It doesn't really matter to their damages model because they don't look at use.  But I want to clear up something I think they want to distract you with.  They've made a big deal about Ollnova didn't pick up the phone and call.  You remember that?

I think they wanted you to believe that that means damages can't possibly start until the date of the complaint, but that's not right.

Remember, there is indirect infringement and there's direct infringement.  Direct infringement is for them selling the products.  They infringe directly, and for that they are liable even if they did not have knowledge of the patent.

And why?

Patents are publicly available.  You think if Exxon goes out there drilling they get to say, well, I didn't know whose land it was so I don't have to pay until you come and tell me it's your land.  That's not the way that mineral law works and it's not the law here.

So why is it that they're able to try and make this argument that damages should start at the date of the complaint?

It's called marking.  We heard about it at the end of the jury instructions.  And this is where APOGEE comes in.  We heard about APOGEE this week, and I think it was a little confusing about why it mattered.  I think they wanted it to be confusing.  But this is where it matters.

I'm going to let them explain it to you, but let me tell you what's really going on.  This is their ticket out of $30 million of use.  To get to this ticket out, you have to believe that a sophisticated company like Siemens didn't get it done right; that they were supposed to slap these patent numbers on a system, and because they didn't ecobee gets excused for six years of being on our property without

permission.  APOGEE wasn't a system that needed to be marked. Siemens knew it, we know it, and you know it.  So on the question of the date when damages begin, we ask that you check March 8th, 2016.

I'm going to get one more chance to talk to you, but before I do Mr. Sandonato is going to present ecobee's closing argument.  And when he's up here talking and he starts telling stories, each time he does I want you to see if he's going to tie it to something that matters.  Is he going to tie it to the jury instructions, is he going to tie it to the claim language, is he going to tie it to a question that you're going to be asked?  If he doesn't, you know it's more stories, they're wasting your time, and they're trying to distract from the real issues.

THE COURT:  Defendant may now present its closing argument to the jury.

Would you like a warning on your time, Mr. Sandonato I would, Your Honor.  Thank you very much.  Three minutes please.

THE COURT:  Three minutes.  I'll warn you when you have three minutes remaining.

You may proceed with closing argument.

MR. SANDONATO:  Thank you, Your Honor.  May it please the Court.

ecobee's products work differently, and those differences

1278

matter.  You heard me say that before.  Those are the last words that I said to you at the end of my opening statement last Friday, and they're the first words that I'm saying to you today because they're the most important words in this case.  ecobee's products work differently and those differences matter.

Now, how do we know this?

Well, we learned at this trial how ecobee's products work.  We learned it from ecobee's engineers.  We learned it from Doctor Souri.  And we learned from Doctor Souri that they don't use these patents.  And I'll talk about that in a little bit.

During opening statements I also talked about how proud I am to represent ecobee in this case, and I'm going to repeat that now.  And I also want to say how proud I am to have worked with this great trial team.  Mr. Manny Caixeiro, Ms. Jennifer Ainsworth, Ms. Megan Woodworth, Jason Dorsky, Dan Apgar, and of course Mr. Eddie Fisher who helped us with our slides and our demonstratives.

And on behalf of this whole team and on behalf of Mr. Lombard and ecobee, thank you very much for the hard work that you put in this week.  We really do appreciate it.

Now, before I jump into non-infringement, I'd like to talk about some of the things that we all agree upon, because there really are some things we all agree upon and I think

those things go a long way to getting us to the right answers in this case.

First, we all agree that the only innovator in the courtroom this week was ecobee.  Their own attorneys said that, that ecobee made a big achievement, that they brought all this technology together.  And they were right about that.

ecobee invented the world's first smart thermostat. ecobee, not Ollnova, made this achievement.  In fact, Ollnova never made a thing.  It was formed in 2021 to buy some patents and bring some lawsuits.  They have no employees, certainly no engineers.  There's no innovation that goes on at Ollnova.

We also agree about the problems that these patents were dealing with:  The problems of many devices talking on a network, problems of crosstalk; problems of interfering messages, lots of components all trying to talk at once; problems of power consumption, all of these devices sending lots of messages and using up too much power.  Ollnova agreed from the outset that these are the problems that the patents were addressing.  They were trying to solve.  Problems faced in large building automation systems like APOGEE.

But Ollnova never addressed the fact that ecobee's products don't have these problems.  ecobee's products are for private homes, not large buildings with hundreds of devices.

Now, why does this matter?

It matters because ecobee's products are different.

ecobee developed its products independently.  Ollnova doesn't dispute that.  And when it developed its products, it was solving problems that were completely different from the problems that the patents were dealing with.  And because ecobee had different problems, they came up with different solutions.  They don't do the things that these patents do.  That's why we spent so much time at this trial focusing on the way our products work.

We also know that ecobee didn't know about these patents until the day it was sued by Ollnova.  You heard that from ecobee's witnesses, and you heard Ollnova's director, Mr. Padian, say that he never contacted ecobee before bringing the lawsuit.  He sued out of the blue.

We also agree that Siemens never sued ecobee; that during all the years that Siemens owned these patents, while ecobee was selling its smart thermostats, Siemens never sued ecobee.  Siemens, one of the world leaders in building automation, Siemens who knew these patents and knew what they covered never thought that ecobee was infringing.

Another thing that we all agree on is the burden of proof.  We all agree that it's Ollnova's burden to prove infringement.  Now, we fundamentally disagree on the answer to the question, but we all agree that it's their burden.  And it's worth taking a moment here to think about and talk about what the burden of proof is.  So often when we think about the

1281

burden of proof, we think in terms of whose evidence is better.  Ms. Fair mentioned that.

But a more fundamental way, a more basic way to think about the burden of proof is that it's Ollnova's burden to show you that ecobee's products use these patents in an understandable way.  If they haven't done that, if they haven't gotten you to the point where you can see and understand why they think ecobee's products are infringing, they haven't done their job, they haven't carried their burden, and there can't be infringement.

So let's start to talk about the evidence that you saw at this trial and the infringement question.

From us you heard from Doctor Souri.  Doctor Souri was very plain, he was very clear, he was very understandable, and he was very to the point.  He took you through the patents, he explained what they are, what they're about, how ecobee's products work, and explained why the products don't infringe.  The material is complex, but Doctor Souri made a great effort to explain things clearly.  And I think he accomplished that.  His drawings were understandable.  He showed you the source code, where it mattered.  And when he showed it to you he explained to you what it was doing and why it mattered.

Ollnova's witness on infringement, Doctor Madisetti was very different.  Doctor Madisetti is a teacher.  He's been a teacher for 30 years.  But when he came to this trial, he just

1282

couldn't teach.  Now, I'm not saying this to disparage Doctor Madisetti or to disparage his teaching ability.  I'm sure that when it comes to teaching science, when it comes to teaching engineering, he's a very fine teacher.  The problem with Doctor Madisetti here at this trial had much more to do with the subject that he was teaching, the so-called infringement analysis.

Let's look at what he was trying to teach here.  The patents are about solving a problem in large building automation systems.  The patents came out of APOGEE, a system that was designed for large buildings with hundreds of sensors.  And he was trying to get you to believe that ecobee's products, which are used in private homes, use the patents.  And yet at the same time, he was trying to get you to believe that APOGEE doesn't use the patents even though APOGEE is discussed in the patents, even though the patents call APOGEE an embodiment of the patents.  That's a subject that even the best teacher in the world can't teach.

Doctor Madisetti's other issue is that he didn't do his own research.  He didn't have all of the information.  This case is about source code, not just on the thermostat but on the server.  It's largely about how the thermostat and the server talk to one another.  And the source code on both are important.  And even though ecobee made the entirety of its code available, you heard 5 million, 10 million lines of code,

1283

that could be relatively easily searched using search tools, Doctor Madisetti never bothered to go and review it.  Instead he sent someone else.  And Doctor Madisetti only reviewed the code that was given to him.  And none of that was from servers.

Doctor Souri reviewed all the code.  Doctor Souri had the full picture.

So now I'll jump into the non-infringement evidence that we presented.  And we all know that it's the words of the claims that matter, and so I will be focusing on the words of the claims.

And I'll start with the '282 Patent.  This is a patent that to solve this network congestion problem uses a set-up where it communicates only a portion of the stored data.  If word 'portion' is right here in the claim.  And using the patent as a guide, Doctor Souri explained that this is about sending a subset of the stored data, not all the stored data.  And I'm sure, I hope, you remember the ice cream example that he gave.  If the stored data is vanilla and chocolate and strawberry then the patent may be about sending only the vanilla ice cream, or only the strawberry ice cream, only the portion that you need.  ecobee's products don't do that.  We send it all.  The vanilla, the chocolate and the strawberry.  And we can do that because we don't have the crosstalk and congestion problems.  That's our solution, and that works best

1284

for us.

Now, what did Doctor Madisetti have to say about this?

Well, on cross examination we asked him whether the ISM message contains all the remote sensor value, and his answer was yes and more. Now, I'm not sure what Doctor Madisetti meant by and 'more' here, but the point is that he agreed that the message contains all the sensor data--vanilla, chocolate, and strawberry. Adding something more, putting some whipped cream or cherry on the ice cream, cannot make it a portion when it's not a portion. It's not a subset; it's a whole.

ecobee's products send all the data, not a portion of the data, and they don't infringe.

Now, the '495 patent is what Ollnova calls the two networks, the two wireless networks patent. And to infringe here there needs to be a first wireless network and a second wireless network in the building. Now, Doctor Madisetti called the first wireless network the -- excuse me. Doctor Madisetti called the first wireless network the green radio network here and he called the second wireless network the blue WiFi network. But he admitted that ecobee's products -- excuse me -- that to have a WiFi network you need to have a router and a modem. And he admitted that ecobee doesn't sell those things.

And contrary to what Ms. Fair says, many of our customers do use our smart thermostats without WiFi. They're still

smart thermostats.  There's still lots of smart functionality that you can access on the thermostat itself without WiFi. And many of our customers, as you heard from our witnesses, do that.

But even when the WiFi router and modem are there, there's no infringement.  And that's because the claim says that the first network must control communication free of -- excuse me -- control components, excuse me, free of communication with the second network.  The first network must ignore the second network when it's controlling the components.

Doctor Souri explained that when the WiFi is set up with the thermostat, the thermostat is always in communication with the internet.  It's always getting data for control from the server.  And so when WiFi is set up, the thermostat is never in control of components free of communication from the server.

Moving to the '371 Patent.  This one is about repeating messages at regular intervals.  I'm showing one of the claims here which uses the word 'repeating'.  The other claim doesn't have the word 'repeating' in it but it still talks about sending messages at regular intervals according to a schedule. And Doctor Souri explained that both claims require that the same messages be repeated more than once.

And Mr. Hietala, who I'll talk a little bit more a little

later on, Mr. Hietala explained that each message that the thermostat sends is a unique message.  It doesn't attempt to resend the same message from before.  Now why does Mr. Hietala know that?  Mr. Hietala knows that because he wrote the server code.  He knows the server code.  He knows what information the server gets from the thermostat, and he knows that he never gets -- or the server never gets a message that's repeated.

And Doctor Souri explained that -- excuse me.  And Doctor Souri explained that Doctor Madisetti did not show us any source code that shows repeating the same message.  And we saw that at trial.

What did Doctor Madisetti say about all this?

Well, he, in essence, ignored the word 'repeating' from the claim.  The word 'repeating' is there.  It's in claim 17 of the '371 patent.

And he was asked:  Repeating information can be sending the information just once?

And his answer was:  It depends on the context of the claim.

To Doctor Madisetti sending something just once can be repeating it.  He says it's depending on the context.  The context for him is that he wants to find infringement.  In order to find infringement he's willing to say that sending something just once is repeating.  That's not context.  That's

1287

ignoring the words of the claim.

ecobee's products don't send messages more than once, they don't repeat, and they don't infringe.

Now, the '877 patent is the one that's about suspending transmission of the message.  And the Court construed this term 'suspending transmission' and it said -- and the Court said that this means that the transmission of a message that would otherwise occur must be stopped.  ecobee's products don't do this.  Once we start a transmission, we always finish it.  We never stop the transmission.

And here Doctor Souri explained exactly how we send our messages.  Here he showed you source code.  He showed you the source code in something called the communicator, and that's the part of the code that's responsible for actually sending the ISM and the SCM, the messages that are important here.  And he explained that once the data has been passed to the communicator, it's always sent, there's nothing that can stop it.

Now, what does Doctor Madisetti say about this?

Well, Doctor Madisetti never even talked about the communicative code at all.  He doesn't want you to get there.  He wants you to accept that deleting information before it gets to the communicator is stopping, but that's not stopping; that's deleting information.  That's not -- that's simply not sending information that's been deleted.

1288

And here's another place where I thought that Doctor Souri's example was excellent.  The angry email.  We've all written the angry email.  We write it, we think about it, we delete the email before we hit send.  That's not stopping the transmission.  That's not sending the transmission.  Two very different things.  Putting a letter in your pocket is not stopping the letter, it's not sending the letter.  In ecobee's products, once we pass a message to the communicator, it's always sent.  We never stop it and we don't infringe.

Now, we heard a little bit about direct -- indirect infringement, excuse me, from Ms. Fair, and indirect infringement is something that is part of the Court's instructions, and something that you'll need to consider.  And with indirect infringement, there's a few important things.

First, indirect infringement requires direct infringement.  So if there's no direct infringement--and there is no direct infringement for all the reasons that I just explained-- if there is no direct infringement, then there can be no indirect infringement.

But in addition, indirect infringement requires some additional things, and one of the things that it requires is that Ollnova would need to prove that ecobee knew that its products infringe.  And here the evidence shows just the opposite.

As you learn, ecobee never knew about these patents until

it was sued by Ollnova.  And since then, it's been vigorously defending itself, explaining to Ollnova, and this week explaining to you, why it doesn't infringe.

Now I'll turn to invalidity.  And you'll be asked the questions of invalidity for two of the patents, the '495 and the '282.  And here the burden is on ecobee.  The standard is clear and convincing evidence.  And our evidence on invalidity on these two patents was very strong.  We presented the testimony of our expert, John Martens.  His analysis was thorough, it was thoughtful, and it was independent.

And I'll start with the '495 patent.  And you might remember the '495 patent is one in opening that I called a special case.  And I said it's a special case because you're going to be asked a special question about it.  The question of patent eligibility.  Patent eligibility, again, goes to what I think of as a fundamental question about whether what's being patented is the kind of thing, the type of thing, that can be patented in the first place.

And from Doctor Martens' analysis this means that he needed to consider whether the subject matter of the claim involved technology that is not well-understood or -- excuse me -- that goes beyond something that's well-understood, routine, and conventional.  And here the evidence was overwhelming that the claims don't pass the test.  The only technology in the claims are things that are very

well-known--wireless networks, sensors, communication components, building components, things that were very well-known.

Doctor Martens explained that all of these things were conventional back in 2004. As a matter of fact, even the patents admit that. Two wireless networks, two protocols. The patents explain that Bluetooth was known and WiFi was known. As a matter of fact, as we learned at this trial, those things were so well-known that they're industry standards.

And so when you're deliberating, please read the claims, look at the claims of the '495 patent, look for technology that was not conventional back in 2004. It's simply not there. These claims are about nothing more than a concept that uses two wireless networks and two protocols.

So that's the first reason that the '495 patent is invalid. It contains only conventional technology.

The remaining issue for the '495 patent is -- and for the '282 patent relates to what we call prior art, the question of whether the inventions that are claimed were already known. And in this case what's often a case in many patent litigations is not even an issue, the question of whether what we brought to trial really is prior art. Here Doctor Madisetti admitted that the pieces of prior art that Doctor Martens relied on, Mesarina, Herrmann, and Ahmed all came

1291

before the '495 and the '282 patent.

So I'll start with the '495 patent again.  And here what I'd like to do is compare what Ollnova has said is the problem with the '4 -- that the '495 patent addressed with the problem that Ms. Mesarina was addressing in her patent and then compare what Ollnova said is the solution with the solution of Mesarina.

So in opening statement Ollnova said that the problem of the '495 patent was multiple devices talking wirelessly on the network and clogging things up.  And Mesarina--and, again, Mesarina came first--that problem was dealing with data from a large number of sensors where the computer would become a bottleneck.  The same problem.

And in its opening Ollnova said that the solution was that the Siemens and its inventors discovered a way to have two wireless networks.  And that's exactly what Mesarina does. It has a wireless computing node network shown in green and a second network, a wireless sensor network, shown in red.  Two networks, two protocols; same problem, same solution.

The other patent -- the other invalidity analysis that Doctor Martens presented was for the '282 patent, and this was based on a prior art reference called Ahmed.  And Doctor Martens showed you how Ahmed disclosed everything in the '282 patent claim.

Now, what did Doctor Madisetti say about this?

1292

Well, Doctor Madisetti's problem with this reference -- I should step back. This patent was largely about a multi-sensor package, a package having more than one sensor. And the Court construed multi-sensor package here to mean a single package sensor device, not a group of individual sensors. And Doctor Madisetti admitted that there's multiple sensors in Ahmed, a temperature sensor, a pressure sensor, a humidity sensor, but he criticized Ahmed because all those sensors were on the same substrate or the same chip. Now, that makes no sense at all. He wasn't saying that they were on different chips; he was saying that they were on the same chip. That puts them on the same device. As a matter of fact, Ahmed expressly said that it's teaching that several sensors are incorporated into a single device as a sensor suite. That matches the claim construction. Ahmed shows everything that the '282 patent claims. Nothing is missing from Ahmed.

Now, Ms. Fair discussed the issue of marking and I'll discuss it a little bit as well. You heard from the Court instructions on marking. This has to do with the APOGEE system, which you heard so much about at this trial, the question of whether APOGEE is covered by the claims, whether APOGEE uses the claims.

And when you read the Court's instructions here, you see there's no question about whether APOGEE could be marked. The

question you need to determine is whether Ollnova has carried its burden to prove that the APOGEE system does not practice any claims of these three patents.  That's the issue that you must decide, not whether it could be marked, but whether it was covered by the claims.

And here all we heard from Doctor Madisetti was his bare conclusion, his bald conclusion that APOGEE was not covered.  He presented no analysis whatsoever.  And so there's no question that Ollnova didn't carry its burden on marking.

So this question, of course, only arises -- you're only going to deal with this question if you find infringement and validity.  And we don't think you will.  But if you do get to damages, there's no question that Ollnova failed to mark, and there's no questions that damages can't begin any earlier than March of 2022 when Ollnova filed its complaint.

Now I'd like to talk about some of the fact witnesses, because I think they were an especially important part of the case and so I'd like to talk about them a little bit now.

And I'll start with Mr. Hietala.  Mr. Hietala was a -- is a software engineer at ecobee.  And he didn't come to this trial to show you that he's a nice guy.  He came to this trial to show you how ecobee's products work.  Again, what's at issue here is the way the server and the thermostat talk, the way the server talks to the thermostat and the way the thermostat talks to the server.  And he designed the code on

1294

the server.

And if I could set -- sum up Mr. Hietala's testimony with one phrase, I would say keep it simple. We keep it simple. Our products are used in simple environments--a home with one or two thermostats and one or two sensors, if the customer is using sensors. And because our products are used in a simple environment, we keep our messages simple. We have an ISM that's sent every 15 minutes no matter what. We have an SCM that sends a snapshot whenever something changes. We send the messages only once. We don't repeat them. We send the whole thing, but we never send just a portion. And once we decide to send a message, we never stop or suspend transmission. We keep it simple. We have a simple environment. We are able to use simple solutions. We don't need the solutions of these patents.

What did Mr. Laurence tell us?

Well, he told us home grown, ground up. ecobee develops its technology on its own, using its own engineers, its own scientists. And when it builds a product, when it makes a product, it does so from the ground up, starting with a blank sheet of paper. And building from the ground up is exactly the opposite of what Mr. Bergman and Doctor Madisetti did with their so-called non-infringing alternatives.

Now, I want to pause a second to make sure that everybody understands what a non-infringing alternative is. ecobee's

products don't infringe.  They don't need to be changed, they never were changed, and nobody on the ecobee side ever said that they should be changed.

The non-infringing alternative here is a theoretical or academic exercise that Doctor Madisetti and Mr. Bergman did together to try to justify Mr. Bergman's--quite frankly there's no better word for it--outrageous damages number.  It's something that they concocted in their minds.  But unlike Mr. Laurence, neither Doctor Madisetti nor Mr. Bergman have ever built a commercial product of any kind, let alone a smart thermostat.

And as Mr. Laurence told you, if ecobee were to build a new sensor, it would start from the ground up; it wouldn't put together a Frankenstein sensor the way Mr. Bergman and Doctor Madisetti would have it.  Doctor Madisetti and Mr. Bergman's non-infringing alternatives simply aren't supported by science or technology.

Mr. Banderk, Mr. Banderk was -- is ecobee's chief marketing officer and chief revenue officer, and for him I'd sum it up as do your homework, do your research.  Don't do what Ollnova's damages expert, Mr. Bergman, did.

Everyone in this case agrees the Court's instructions say that the question on damages turns on the price that Siemens and ecobee would have agreed to for a license.  But when Mr. Bergman did his analysis and reached his conclusions, he

didn't even know about the Siemens sale.  He didn't even know about that price that Siemens sold its large patent portfolio for.  And because the courtroom is open, I can't say the price.  But I think we all remember it.  That was the price that Siemens got for over a hundred patents--these patents in this case were just four--and that price, as we know, is a far, far cry from the outrageous number that Ollnova is asking for.

Mr. Bergman also didn't do his homework when he relied on the Jungle Scout report.  And make no mistake, the Jungle Scout report is not an ecobee document.  It's not something that ecobee created.  In the course of a litigation the parties are required to exchange a large number of documents in their files.  They don't get to pick and choose.  It's a very transparent process.  And as part of that process, we had the Jungle Scout document in our files, unsurprisingly.  And we produced it to Ollnova, as we were required to do.  But it's not our report.

Mr. Bergman took this report and he used this report without even knowing what it was, without even knowing that it was only about Amazon sales, not about the sales in the market as a whole.  And he used it to conclude that ecobee should pay more than 15 times what Carrier paid, for just four patents, not for the hundred-plus patents that Carrier got.  Carrier, one of the biggest companies in the HVAC business, a company

that, as Mr. Banderk told us, is 80 to a hundred times the size of ecobee.

Now, Ms. Fair said that nobody on the ecobee side provided any evidence that the patents, all those patents that Carrier got, were about something other than smart thermostats, but nobody on the Ollnova side provided any evidence that they were just about smart thermostats. And there's no dispute that the license that Carrier got was to all products. Carrier could do anything with them, not just smart thermostats. And Carrier is a very large company with a very big business and a large number of products.

Now, Ollnova's witness, Mr. Padian, Ollnova's director, what did he tell us?

Well, Mr. Padian is a lawyer. He's a lawyer who buys patents and tries to monetize them. And what did he come to court to tell us?

He came to court to say that ecobee was hostile for telling him that we don't infringe. He was angry because, to use his words, ecobee wouldn't admit infringement. ecobee wouldn't admit infringement because ecobee doesn't infringe. And it's not at all clear to me why Mr. Padian is angry at that. He's the one who sued ecobee, and he's angry at ecobee for telling him that we don't infringe.

So now I'm going to talk about the -- the verdict form, because it's an important part of what you'll be asked to do

1298

when you deliberate. And the first question that you'll be asked is did Ollnova, the Plaintiff, prove by a preponderance of the evidence here that ecobee, the Defendant, infringed any claim of the asserted patents. And the answer to this question is no. And the answer to this question is no because ecobee doesn't use the patents. ecobee doesn't repeat messages, ecobee doesn't send a portion of information, ecobee doesn't stop transmissions. ecobee doesn't use the two-wireless-network patent for all the reasons that Doctor Souri explained, for all the reasons that I reviewed with you.

Question 2 goes to this question of subject matter eligibility on the '495 patent. It's a question of whether there is any technology in the '495 patent that goes beyond what would be well-understood, routine, and conventional. Here the issue is our burden. And here the answer is, yes, we did carry our burden. We showed you that two wireless networks, two protocols, and any other technology in the '495 patent claim was very well-understood as of April 9th, 2004. So on question 2, the answer is yes.

Question 3: Did ecobee prove by clear and convincing evidence that any of the asserted claims are invalid as anticipated or obvious in light of the prior part? And you'll need to answer it for each claim, claim 1 and 2 for the '495 patent, and claim 1, 3, 6, and 21 of the '282 patent. And here again, the answer is yes. We showed you that prior art

that I discussed with you a few moments ago.  Mesarina for the '495 patent, also Herrmann for the '495 patent, Ahmed for the '282 patent, and some other references.  And we showed you that those references disclose everything about these claims.  So when you get to question 3, please answer yes for all of the questions.

So, ladies and gentlemen, I'm going to sit down shortly.  This is the last time that I can speak to you.  Once I sit down, as Ms. Fair indicated, she'll get a chance to come up and speak to you again.  That's the way the process works.  Ollnova brought the case, they have the burden of proof, and so they get to come again and speak to you.

As you listen to Ms. Fair, as you deliberate, please keep in mind everything that I said, keep -- please keep in mind the evidence that we showed you, the evidence of how our products work, the evidence of why they don't infringe, and the prior art evidence that we showed you that validates these patents.

Thank you again very much for your hard work.  We know how hard you worked during this trial.  We know the material can get challenging at times.  We know that both parties threw a fair amount of information at you.  But there were a lot of issues to address.  We took this case very seriously.  We did not engage in distractions as Ms. Fair accused us of.  We brought to this trial the evidence that matters, the evidence

that you need to decide the issues that you need to decide--how our products work, why our products don't infringe. We were very careful about the evidence, we were very clear about the evidence, and we didn't waste any time in conducting cross examinations on issues that just didn't matter.

I'm going to leave you with those exact same words again--ecobee's products are different, and those differences matter. We made our products to address the problems and challenges that we have.

THE COURT: You have three minutes remaining.

MR. SANDONATO: Thank you, Your Honor.

We made -- we made our products to address the challenges and the problems that we have. Our problems and challenges are different than the problems and challenges that Siemens had. ecobee's products are different and those differences matter.

Thank you again. We really appreciate your hard work, your attention, and good luck with your charge.

THE COURT: All right. The Plaintiff may now present its final closing argument. You have eight minutes and 24 seconds remaining, Ms. Fair.

Would you like any additional warning on your time?

MS. FAIR: May I have a two-minute warning, please?

THE COURT: I'll warn you when you have two minutes

remaining.

You may proceed with your final closing argument.

MS. FAIR:  Thank you, Your Honor.

Mr. Sandonato just told us there was a lot of material in this case.  There was a lot of material in this case because we had a laundry list of defenses from ecobee.  They say we don't infringe.  They say if we do infringe the patents aren't valid.  They're not valid because they're conventional.  They're not valid because this figure in some other patent disclosed everything.  They say the damages are wrong.  They say the form of damages is wrong.  They say the start date for damages is wrong.  There's a lot of material there, and there's a lot of material because they had a lot of distractions.

Did you notice when Mr. Sandonato started, he started with three things that we know don't matter for this case.  He wants to tell you ecobee is innovative.  Nobody disputes that.  We were the first ones to tell you that in opening.  We give them credit for coming to market with the first smart thermostat.  But that doesn't mean that they're not on our property.

Why do they keep talking about it?

Why do they keep wasting our time with it?

They tell us Ollnova didn't invent anything.  This case isn't really about Ollnova, and we told you that in opening.

That's why Mr. Padian's testimony was so short, because it doesn't really matter.

The founders of this country decided that the right way to foster innovation was to create a property right, intellectual property, a deed in the form of a patent. Ollnova is the property owner. And there is no instruction that we've heard from the Court that gives ecobee a free pass to be on the property just because Ollnova didn't invent it.

We also heard about, oh, we've got different problems than what Siemens had. When you get back there and you look at the jury instructions and you look at the claim language, I want you to look for should we be looking for whether or not they were solving a different problem? No.

They use the same technology because it works in a lot of settings. It works in the commercial setting, which Mr. Banderk told us their own thermostats go in. It's irrelevant what problems were being solved. What matters is the claims.

And lastly, they said Ollnova didn't pick up the phone and call. And you know that that's not relevant, because you don't get a free pass to be on someone else's property just because you don't know whose it is.

Their own damages model tells you all you need to know about that. It's no different regardless of the start date. It doesn't matter. You've seen the positions they've taken in

this lawsuit, the stories they've told, the time that they've wasted, all the material we've had to go through.

Our country decided from the very beginning that property is important and that property should be protected, whether it's real property or intellectual property.  If you have real property, we have a sheriff.  You can call the sheriff and get someone off of your property.  But to protect intellectual property, we have a jury.  We have you.  You're the only ones who can tell ecobee to pay for being on our property without permission.  That's what we're asking you to do.

We thank you for your time, we thank you for your attention, and we thank you for your service.

We look forward to getting your verdict.

THE COURT:  All right, ladies and gentlemen.

I need to give you a few additional instructions before you begin your deliberations.

You must perform your duties as jurors without any bias or prejudice as to any party.  The law does not permit you to be controlled by sympathy, prejudice, or public opinion.  All parties expect that you will carefully and impartially consider all the evidence, follow the law as I have given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form based on the facts you find them to be, following the instructions the

Court has given you on the law.  Again, do not decide who you think should win this case and then answer the questions to reach that result.  One more time let me remind you that your answers and your verdict in this case must be unanimous.

You should consider and decide this case as a dispute between persons of equal standing in the community, equal worth, and holding the same or similar stations in life.  This is true in patent cases between corporations, partnerships, or individuals.  A patent owner is entitled to protect his rights under the law of the United States.  And this includes bringing a suit in a United States District Court for money damages for infringement.  The law recognizes no distinction among types of parties.  All corporations, partnerships, other business organizations, and individuals stand equal before the law regardless of their size, regardless of who owns them, and they are to be treated as equals.

Now, when you retire to the jury room in just a few minutes to deliberate on your verdict, as I've told you, you'll each have a copy of this final jury instruction or charge to the jury to take with you.  If during your deliberations you desire to review any of the exhibits which the Court has admitted into evidence over the course of the trial, you should advise me by a written note signed by your foreperson and delivered to the Court Security Officer who will then bring it to me and I will send that exhibit or those

exhibits to you.  Once you retire, you should first select your foreperson and then conduct your deliberations.  If you recess at any time during your deliberations, continue to follow all the instructions the Court has given you about your conduct during the trial.

After you have reached a verdict, your foreperson is to fill in the verdict form with your unanimous answers, date and sign the verdict form, and then advise the Court Security Officer.  You should not reveal your answers until such time as you're discharged, unless otherwise directed, and you must never disclose to anyone, not even to me, your numerical division on any unanswered question.

Any notes that you've taken over the course of the trial are aids to your memory only.  If your memory should differ from your notes, rely on your memory and not your notes.  The notes are not evidence.  And a juror who has not taken notes must rely on his or her own independent recollection of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any other -- to any greater weight than the recollection or impression each juror has about the testimony.

Now, if you want to communicate with me at any time during your deliberations, you should give a written message or a question signed by your foreperson to the Court Security Officer who will bring it to me, and I'll then respond as

promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally. I will always first disclose to the attorneys in your case your question and my response before I answer any question.

Now, after you've reached a verdict and I have discharged you, I've accepted your verdict and I've discharged you as jurors in this case, I want you to understand you are not required to talk with anyone about your service as a juror in this case. But by the same token, at that time you will be completely free to talk about your service in this case as a juror. Whether you do or whether you don't is 100 percent up to each of you. It is your decision.

I'm now going to hand eight printed copies of these final jury instructions and one clean copy of the verdict form to the Court Security Officer who will deliver it to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to deliberate upon your verdict. We await your decision.

(Whereupon, the jury left the courtroom.)

THE COURT: Counsel, you are welcome to wait in the courtroom or to leave someone here to wait with regard to what the jury may do. I also should have, or my staff will get from you, cell phone numbers where I can call if you're off the premises. I would ask that if you're off the premises you

not go far so that you can return quickly if we get a note or when we get a verdict.

Pending either a question from the jury or a return of their verdict, we stand in recess.

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, I've received the following note from the jury. I'll read it and then I'll hand it to the Courtroom Deputy. It says "Can we get another copy of page 5, 6"; a comma between the 5 and 6.  It's signed by the foreperson Bruce Green.

I'm going to mark this in the upper right-hand corner with a 1 identifying it as note No. 1, and I'll hand it to the Courtroom Deputy.

My thought, counsel, is the simplest is -- just to be cautious, is to send the jury a completely clean copy of the verdict form.  That's what I would propose to do.  I can send them just pages 5 and 6, but in case there's another page or in case there's -- in case they've looked at, you know, another page and written 5 and 6, I don't want to have to get another note.

The most cautious thing, in my view, just send them the completely new verdict form.  But does anybody have an objection to that or a problem with that?

MR. COOPER:  No objection from the Plaintiff, Your

Honor.

MR. CAIXEIRO:  None from the Defendant.

THE COURT:  Okay.  Then I've prepared a response. It says, "Members of the jury, in response to your jury note, I am sending you a clean copy of the entire verdict form."

And I'll sign that note, and I'll paperclip a clean copy of the verdict form to it, and I'll hand it to the Court Security Officer and direct him to take it to the jury.

I also have a duplicate of my note to the jury that I'll hand to the Courtroom Deputy.

Counsel, it's 4:30.  I don't know how much longer the jury's going to deliberate.  At this point I'm prepared to keep them up here at least another hour and see what they do. If we get to 5:30 or close to 6:00, we'll talk about whether I want to send them home for tomorrow or not.  At this point, though, I think we'll let them just continue to deliberate.

With that, Court stands in recess.

(Deliberations continue.)

THE COURT:  Be seated, please.

Counsel, I've received the following message from the jury.  I'll read the message and then I'll hand the document to the Courtroom Deputy.  It says, "We have reached a verdict."  It's signed by Mr. Green Juror No. 1 as the foreperson.

I'll hand the original message to the Courtroom Deputy.

I'm about to bring in the jury and receive their verdict. It goes without saying that the Court expects no reactions one way or the other from anybody in the courtroom.

All right.  Mr. Barnett, let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen.

Mr. Green, I understand that you are the foreperson of the jury.  Is that correct?

THE PRESIDING OFFICER:  Yes.

THE COURT:  Has the jury reached a verdict?

THE PRESIDING OFFICER:  We have, Your Honor.

THE COURT:  Would you hand the completed verdict form to the Court Security Officer who will bring it to me?

Ladies and gentlemen of the jury, I'm going to announce the verdict into the record at this time.  I'm going to ask that you each listen very carefully as I do this, because after I've announced the verdict, I'm going to poll the jury to make sure and confirm that this is the unanimous verdict of all eight members of the jury.

Turning to the verdict form and beginning on page 4 of the verdict form where Question 1 is found, "Did Ollnova, the Plaintiff, prove by a preponderance of the evidence that ecobee, the Defendant, infringed any of the asserted claims of the asserted patents?"

The jury's answer is "Yes."

Turning to Question 2, "Did ecobee prove by clear and convincing evidence that the limitations of the asserted claims of the '495 Patent, when taken individually or when taken as an ordered combination, involve only technology which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional as of April the 9th, 2004?"

The jury's answer is "No."

Turning to Question 3, "Did ecobee prove by clear and convincing evidence that any of the following asserted claims are invalid as either being anticipated or obvious in light of the prior art?"

With regard to the '495 Patent, claim 1, the jury's answer is "No."

Claim 2 of the '495 patent, the jury's answer is "No."

Claim 1 of the '282 Patent, the jury's answer is "Yes."

Claim 3 of the '282 Patent, the jury's answer is "Yes."

Claim 6 of the '282 Patent, the jury's answer is "Yes."

And claim 21 of the '282 Patent, the jury's answer is "Yes."

Turning to Question No. 4a, "What sum of money, if paid now in cash, has Ollnova proven by a preponderance of the evidence would compensate Ollnova for its damages resulting from infringement?"

The jury's answer is "$11,500,000."

Question 4b, "Is the total amount of the reasonable royalty that you found in Question No. 4a a running royalty for past sales only or a lump sum for past and future sales?"

The jury's answer is "A lump sum royalty for the life of the patents."

Question 4c is not answered, which is proper because it was only to be answered if 4b was a running royalty.

Turning, then, to the last page, page 9 of the verdict form, I find it is dated with today's date and it is signed by Mr. Green as foreperson of the jury.

Ladies and gentlemen of the jury, let me poll you to make sure that this verdict unanimously reflects the entire agreement of all eight members of the jury. If this is your verdict as I have read it, would you please stand up? Thank you. Please be seated.

Let the record reflect that all eight members of the jury immediately rose and stood in response to the Court's question to poll the jury. This confirms that this is the unanimous verdict of all eight members of the jury. The Court accepts your verdict, and I'll hand the original verdict form to the Courtroom Deputy.

This now completes the trial of this case. From the very beginning, ladies and gentlemen, I've instructed you repeatedly about not discussing the case, not communicating about it, and I've instructed you in various other ways with

regard to your conduct.  I am now releasing you from all those obligations and all those instructions.  This means you are free to talk with anyone of your choosing about your experience as a juror in this case.  It also means that you are completely free not to discuss your experience as a juror in this case.  It is up to you and up to you alone.

If the first day on Friday of last week when you walked into your home after you got there and somebody asked, What happened in Marshall in federal court today, you can answer them now, even though you couldn't answer them then.

Also, ladies and gentlemen, I want you to understand that in this district and in this division, it's been the custom and the practice for longer than I can remember, and given my time in practice and my time on the bench, I hate to admit I've lived in this community for more than 40 years, so it's been the practice for at least four decades, and that is when a jury, such as yourselves, returns a verdict in this court, the lawyers cannot initiate a conversation with you about this case, even though I can assure you that all the lawyers on both sides would like to know what your observations and thoughts were about this trial.  But they cannot initiate a conversation with you.  You are free to initiate a conversation with them if you choose to.  It is strictly up to you, and you're under no obligation at all.

But as a practical matter, the way that usually works is,

as you all know, there is one way in and one way out of this building, and when you leave this courthouse and go down those front steps, don't be surprised if there aren't lawyers on the sidewalk at the bottom of the steps hoping you will stop and initiate a conversation with them.  They are not going to initiate a conversation with you, and they are not going to get in your way and they're not going to obstruct anything you want to do; they're just going to make themselves conveniently available in case you want to stop and have a conversation with them.  And if you do, feel free to, and if you don't, feel free not to, and just go about your business and walk on by and go to your cars, do whatever you want to do.  It's strictly up to you.  But I don't want you to be surprised when you leave the building if you see a bunch of lawyers on the sidewalk out front.  That's the way it usually works.

Now, to deal with that over the last couple of years, I've instituted a relatively new practice where I ask both sides to give me a contact person and a cell phone number from each side of the case, and I have those and I've printed them on paper and I'm going to make them available to you.  If you want to take one with you because you don't necessarily want to stop and have a conversation with anybody today but you might want to call somebody in the future and have a telephone conversation, if you think there's any possibility you would ever want to do that, then you can take one of those slips of

paper with you and if in a week or a month you want to make a phone call, you can do that. If you're sure you're not ever going to want to make a phone call for this purpose, then you certainly don't have to take one of those slips of paper with you. But I've done that so you have more options so you don't feel like you have to stop here and feel like you have to have a conversation or not have a conversation. So I'll make those available to you in just a moment.

Also, ladies and gentlemen, I want to thank you for your service in this case. I know it's been a sacrifice. And as a matter of fact, I'd like to ask a favor from each of you. I'd like in just a minute for you to leave the jury box and go back in the jury room and let me come into the jury room and let me shake each one of your hands and let me look each one of you in the eye and thank you person-to-person for your service in this case. I know you've each made sacrifices to be here. I know you each had other places and other things to do during this trial that were important to you and important to people that are important to you; and whatever those were, you put those aside and you did what good citizens do, and you stepped forward and you put yourself forward for service, you were selected, and you served.

And now that process is complete. You've been released by me. And before you go I would just like to take a moment and thank each one of you in person, because I honestly think

what you've done warrants that kind of personal attention.  I promise you I'm not going to keep you other than just a few minutes, but if you would give me that privilege, I'd like to come into the jury room and thank you in person before you leave.

For the record, the Court accepts the verdict of the jury.  That completes the trial of this case.

Counsel, you are excused.

Ladies and gentlemen if you'll do me that honor, I'll meet you in the jury room.

(The proceedings were concluded at 5:20 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts                    10/05/2023

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER